## AMIESITE ASPHALT CO. OF AMERICA v. INTERSTATE AMIESITE CO.

### No. 942.

District Court, D. Delaware.

Aug. 21, 1933.

Hugh M. Morris, of Wilmington, Del., and C. J. Hepburn (of Hepburn & Norris), of Philadelphia, Pa., for plaintiff.

Henry N. Paul and Frank B. Fox, both of Philadelphia, Pa., and Ayres J. Stockly (of Hastings, Stockly & Duffy), of Wilmington, Del., for defendant.

NIELDS, District Judge.

Amiesite Asphalt Company of America filed its bill of complaint charging the defendant, the Interstate Amiesite Company, with (1) unfair competition in trade in the use of the word "Amiesite," and (2) infringement of plaintiff's registered trade-mark "Amiesite" for a "paving composition comprising crushed stones coated with asphaltic or other bituminous, resinous, or carbonaceous matter."

Defendant answers that the right to the use of the trade-name "Amiesite" passed into the public domain in 1926 upon the expiration of certain United States patents granted to Joseph Hay Amies in 1909; and that the alleged trade-mark "Amiesite" was void because it had never been used to signify the source or origin of the patented paving material or pavement, and had been procured by a false representation that it had been so used. Defendant also in its answer by way of counterclaim alleges that it has suffered substantial loss in its business as the result of plaintiff's threats and false representations, to defendant's customers and to the public, that defendant could not make or sell Amiesite, and that those who bought defendant's product could be sued for infringement.

In 1909 the long search of Dr. Joseph

Hay Amies for a "cold mix" in the paving art culminated in the granting of seven patents, the adoption of "Amiesite" as the trade-name for the patented material, and the attempted registration of "Amiesite" as a trade-mark. In the same year 1909, Dr. Amies or Amies Asphalt Company, the assignee of his patents, advanced from the experimental stage and for the first time made a business or commercial use of his inventions. Licenses to manufacturers of paving materials and road builders were granted. The most important Amies patent was No. 934,494, in which he broadly claimed a "new and useful Composition for Paving Purposes," applied for February 20, 1909, and issued September 21, 1909. The process invented was specified in a single claim in these terms: "I place a batch quantity of broken stone, gravel or like materials upon a mixing board or in a mixing machine and mix them with any desirable light oil. I then pour thereon and thereover and mix well therewith a due quantity of boiling asphalt or other like elements suitable for paving compositions. I then throw thereon and mix therewith a due amount of air slaked lime or crushed carbonate of lime or a mixture of these to cover the individual particles of the said composition, and thus form a granular and friable mass that will adhere together and form a solid mass under pressure."

The single claim of the patent reads: "The herein described method of making a composition for paving purposes which consists in taking mineral materials and the like, coating them with a light oil, then mixing them with a binder as hot asphalt, and then coating the particles of the said composition with air slaked lime, crushed carbonate of lime, or lime powder, as fully set forth."

The other six patents granted upon applications filed between December 26, 1908, and May 1, 1909, and issued between August 3, 1909, and December 7, 1909, all related to the paving art and cover a variation in or improvements upon the process of patent No. 934,494. These seven patents became known to the trade as the "Amies 1909 patents."

Briefly, the cold mix produced from the Amies process when ready for market is "a granular and friable mass," in formation not unlike popcorn, composed of (1) an aggregate, preferably a mineral aggregate, (2) a light oil or liquefier, (3) asphaltic cement, (4) lime, and (5) a filler. The use of a light oil or liquefier in the paving art was not new, but the particular use of a liquefier in the Amies process was new. The liquefier is not used merely as a solvent to cut back the asphalt as in other contemporary methods. Dr. Amies taught that a light oil or liquefier should be used to prime or coat the cold stone, and thereby to suspend the solidifying of the asphaltic cement. While in storage or in transport the liquefier keeps the mass in a granular and friable condition. When the mass is laid and packed the volatile liquefier quickly passes off and a solid road surface remains.

In this case we are dealing with the interrelation of a trade-name with a patent monopoly. Was the trade use of the trade-name "Amiesite" for the paving material and the pavement contemporaneous with the monopoly acquired under the Amies patents of 1909? The answer involves a brief review of forty years. This lapse of time can be conveniently divided into three periods: (1) The experimental stage; (2) the early period of commercial use; (3) the period of recognized and undisputed monopoly.

The experimental stage covered the period when the patented paving material was not bought and sold. It covers the personal experiments of Dr. Amies from 1890 to 1907, reference to which will be made hereafter.

The early period of commercial success, or second stage, began in 1908 with the invention by Dr. Amies of paving compositions and methods of laying the same which resulted in his application for the seven patents that issued in 1909. In each of these patents an essential feature is the use of a liquefier or light oil to coat the crushed stone or aggregate before adding the asphalt. The next step was the New Jersey experiment to test the invention, known as the "Magnolia Road" experiment, in Camden county, N. J. This experiment was made by Dr. Amies with the co-operation of a quarry man and the permission of a road engineer. Then followed in rapid succession the application by Dr. Amies' company to register "Amiesite" as a trade-mark; the granting of licenses under the Amies patents to manufacture and sell Amiesite in certain Eastern states and the right to grant sublicenses.

Amies Road Company, the chief licensee of the Amies patents, was organized by a quarry man named Eastburn, and by a road engineer named Albertson. Doubtless Dr. Amies hoped to enlist those concerned with the source of the material for his mixture and those concerned with its purchase.

At the start, Dr. Amies and his licensee ran into difficulties. To grasp this early period of commercial use it is necessary to take

account of these difficulties. They are best indicated in the opening statements of counsel. The solicitor for the plaintiff stated: "After the organization of the Amies Road Company in 1909, the company embarked upon a policy of granting further licenses for the purpose of extending their territory and of course increasing their royalties. They ran into difficulties with the Warren Company, which was the owner of certain patents for road materials, and the Warren Company claimed that the Amies Road Company was violating certain of its patents." The solicitor for defendant stated: "That new and useful pavement was patented by Dr. Amies or attempted to be patented—the patents are not very good patents, but they were intended for that purpose, and there are six or seven of them, and during the 17 years that those patents lasted no one questioned the validity of the monopoly under those patents. It was generally respected."

Dr. Amies made a very real contribution to the paving art. That is recognized throughout the world to-day. But not so at the start. He was then on thin ice with a stalwart competitor ready to push him under. The situation demanded care and caution. "Warrenite," the product of Warren Brothers Company of Boston, was a bitulithic pavement of asphalt and stone. In it a liquefier was also used. In 1909 the broad claims of the Warren patents threatened Amiesite. It was not then realized that the liquefier was to be used differently under the two patents. In "Warrenite" it was a mere cutback for asphalt. In Amiesite the liquefier was a coating for the cold stone before the hot asphalt was mixed with it. Afterwards, the wide flung Warren litigation, including the case in this circuit (Evans v. Warren Bros. Co. [C. C. A.] 240 F. 696), narrowed the Warren invention to the grading of the stone aggregate from the coarsest to the finest with the purpose of filling the voids and effecting a solid stone pavement, as near as may be. Warren patents, Nos. 738,965 and 769,123, cover broadly the use of a liquefier and might have occasioned trouble to Dr. Amies. February 21, 1910, the Amies Road Company prudently obtained a license under these Warren patents limited, however, to the use of this temporary liquefier in the manufacture of Amiesite under the Amies patents where the addition of the liquefier to the cold stone is made before the asphalt is added. These difficulties, although exaggerated at the time, explain the absence of a full disclosure of the Amies process in the Albertson paper (hereafter referred to) and in the early literature and advertisements of the Amies Road Company. Disclosure of the use of a liquefier by Dr. Amies would have invited infringement suits before his invention was fairly launched.

A review of the evidence will establish that a liquefier was used in the manufacture of Amiesite at all times throughout the period of the monopoly from 1909 to 1926, and even until 1930. The only trade-name for the material and pavement so manufactured was "Amiesite." Plaintiff's own literature covers the whole period of manufacture not only by its licensees, but also by its predecessors and their licensees. The Amies patented process of 1909 is the Amies process for manufacturing Amiesite today. From the experiment of Dr. Amies in October, 1908, until to-day, the Amies paving mixture has remained essentially the same. The trade-name of the material has always been "Amiesite."

Plaintiff, in its pamphlet "Amiesite Products" (1930) states: "Specification 'B' Regular Asphalt Amiesite—Laid Cold." "Millions of yards of asphalt coated Amiesite in use over all types of foundations have provided non-skid, long wearing roads at a minimum maintenance cost in many parts of the United States, Canada and Central America. * * * It is shipped from our centrally located plants either by truck or railroad and upon arrival at its destination is unloaded and laid without further treatment or heat and can be stored in piles for use as needed if desired. The proven merits of this material have made it a leader in the field for the past twenty years and assure its continued use in ever increasing quantities."

Plaintiff, in its pamphlet "Amiesite The Interlocked Stone Pavement" (1929) states: "Amiesite is a 'cold lay' paving material that combines the strength and stability of stone with the resilient and lasting qualities of asphalt. * * * A predetermined amount of properly graded stone is weighed into the mixing plant and then treated with Amiesite liquefier to assure complete adhesion to the stone aggregate of the Amiesite asphaltic cement which is added immediately after the liquefier has completely coated each particle of the stone aggregate. The temperature of the crushed stone at the time of adding the asphaltic cement in the manufacture of Amiesite is much lower than the temperature of the asphalt. By this process a thick coating of asphaltic cement is congealed immediately around each stone particle. * * * Nearly twenty years have elapsed since laying the first Amiesite pavement in Media,

Pa. This pavement is still in use and in excellent condition, having required no maintenance in spite of the fact it was on the direct truck route between New York and Washington."

Plaintiff, in its pamphlet "Amiesite The Non-Skid Durable Pavement" (1927) states: "'Amiesite' Pavements are laid with Amiesite mixture which is prepared by combining heated asphalt and clean, dry stone, and so treating the mixture that it can be handled and manipulated immediately, or at any future time, without heating or treatment of any kind, to produce a permanent pavement."

Plaintiff, in its pamphlet "Questions and Answers on Modern Road Surfacing" (1926) states: "1. What is Amiesite? Amiesite is a mixture of hard, tough, durable, broken stone, coated and bound together with asphalt, and so treated that it may be laid cold on the job without any special equipment. * * * 3. What is the difference between Amiesite and other asphaltic paving materials? Crushed stone, the most durable road material known, is the only mineral used. To obtain the greatest endurance, the crushed stone must be properly bonded together with asphalt in such a way that the stone is not heated, nor must the asphalt itself be heated to the point where the bitumen or bonding qualities are impaired. These considerations are protected in the Amiesite process. The stone is treated with a liquefier before the asphalt is added and does not have to be heated.".

Plaintiff, in its pamphlet "Amiesite The Non-Skid Asphalt Pavement" (1925) states: "Dr. Joseph Hay Amies of Pennsylvania developed a process of laying asphalt pavements cold. The mixture made in accordance with this process and the pavement resulting therefrom, are known as Amiesite. The first public use of Amiesite was in 1909, when a pavement was constructed by this method at Media, Pennsylvania, a town not far from Philadelphia. That first pavement is still rendering satisfactory service. * * * Amiesite is a mixture of hard, tough, durable, broken rock, coated and cemented together with asphalt, so treated that it may be handled and laid cold on the job without special equipment. * * * Adhesion of the asphalt to the broken rock in Amiesite is not secured by heating the stone to a high temperature, but by treating it with Amiesite liquefier in the mixer just prior to introducing the heat softened asphalt."

Plaintiff, in its pamphlet "Some Opinions on Amiesite" (1923) states: "Amiesite is a Bituminous Macadam Paving Composition. It is preferably manufactured at central stationary plants. It may be made with portable plants at the road or street side. When made at stationary plants, it may, at convenience, be shipped in gondola cars or other vehicles, and laid, at any future time, without further preparation, on a suitable street or road foundation, and then rolled or tamped to a finished face. * * * The process consists of treating the stone without heating in order to provide for the adhesion of the asphalt. By this the possibility of calcining or disintegrating the stone is avoided, and also the possibility of the hot stone burning the asphalt. It also consists of chemically treating the asphalt so as to retain its adhesive qualities and prolong its life, the result of which is also to render the finished pavement unaffected by changes of temperature."

In 1925, D. M. Hepburn, then and now general manager of the plaintiff, read a paper on "Bituminous Paving Mixtures," etc. which was published in Canada and in this country. He says:

"It is with the fourth class of bituminous mixtures that the writer has been most concerned, and which he wishes to discuss in this paper, 'Amiesite,' the product with which I am associated in the paving field, comes under this description, and is the successful ending of a considerable series of inventions having the same general purpose in view, dating back to 1875 or further. The satisfactory elimination of heat as the means of keeping bituminous mixtures sufficiently plastic to transport and lay, had long been sought.

"However, Dr. Joseph Hay Amies did solve this problem of producing a mixture that could be shipped and laid cold, which solution he accomplished when he invented the paving mixture that, with later improvements, is now known as 'Amiesite.' * * *

"The essence of Dr. Amies' invention is that he first coats the mineral aggregate with a light mineral oil which he calls the liquefier, then covers the surface of his liquifier-dampened aggregate with the asphalt, then adds lime, and finally puts in what is known in 'Amiesite' as mineral filler. Each of the elements of this combination, and their introduction in the order named, seems either essential or desirable and experimental attempts to vary from them have not been satisfactory."

In his annual report to stockholders January 10, 1929, the president of plaintiff said: "When this company was formed in 1923, we

508

were working exclusively under the one Amies patent on Amiesite." It is fair to assume he referred to patent No. 934,494.

The word "Amiesite" was applied to the paving material and pavement of the Amies 1909 patents during the period of early commercial use from 1909 to 1916. This span covered the period of early difficulties.

At the time of the hearing of this case Dr. Amies was dead. However, we have his seven patents issued in 1909, one of which was applied for in December, 1908. In each of the seven patents the use of a liquefier is specified for making the paving material. We have the booklet "Amiesite" of the Amies Asphalt Company signed by Dr. Amies and issued on February 25, 1914. Here Dr. Amies describes the manufacture of Amiesite. "In manufacturing Amiesite," he writes, "broken stone preferably in a cold condition, is placed in a suitable mixing machine. Then, preferably, a cold thin, asphalt oil, lighter than water, is added to serve as a prime coat; a heated prime coat may, however, be employed. Then a heavy Bituminous Binder, at a suitable penetration, moderately heated, is added. After the broken stone has become well coated a suitable amount of a chemical ingredient is added, and all well mixed together; then a necessary amount of water dampened sand is added to render the product granular and friable, and then the product is immediately ready for use or for transportation or it may be stored to be utilized without further treatment, at any future time." This description is opposite a photograph marked "Magnolia Road, Camden County, N. J. Laid October, 1908 Photographed July, 1913." It is perfectly clear that Dr. Amies here described Amiesite manufactured with a liquefier according to his patents of 1909, and that he regarded the Magnolia road as an illustration of his patented pavement.

Amies Road Company, the principal licensee of Dr. Amies, also advertised Amiesite. Some time after 1916 the road company issued a pamphlet, "Amiesite Dustless and Auto-Proof Paving Material Manufactured by Licensees of the Amies Road Company, which Company exclusively controls for the United States all patents of Joseph Hay Amies and Warren Brothers Co., for cold laid bituminous concrete." This company described the process of mixing Amiesite. "The process consists of treating the stone without heating in order to provide for the adhesion of the asphalt. * * * This method allows Amiesite to be manufactured at permanent plants and be shipped in gondola cars to points of use. * * * Upon arrival at destination, without any further treatment, the Amiesite is discharged from the cars, hauled, spread and rolled at the temperature of the air. * * * In the manufacture of Amiesite these difficulties [from hot mixing] are overcome, since the treatment of the stone provides for the adherence of the bituminous binder to the cold stone and, as a result of the process, the Amiesite is in a proper condition for transportation and application." Another pamphlet of the road company was issued in 1910. It states: "After years of experiment there has been placed on the market a material for a wearing surface, which meets with all demands. * * * It is manufactured under patents issued to Joseph Hay Amies and consists of any stone suitable for road construction crushed to a size commercially known as one and one-half inch (1½"), one inch (1"), three quarter inch (¾"), one-half inch (½"), or gravel, as may be deemed best for the work to be performed, coated (without heating) with an asphaltic cement, composed of refined asphalt containing not less than 90 percent of bitumen, and suitable fluxes to give desired results. * * * It is loaded directly from the mixers into gondola cars, is in a friable and granular condition, and upon arrival at destination is ready for immediate use without any further treatment." In this pamphlet no liquefier is expressly mentioned. However, the material is "manufactured under patents issued to Joseph Hay Amies," etc. What patents? In 1910, the only patents of Dr. Amies for a "cold mix" were the 1909 patents. In advertising a "cold mix" the road company must have manufactured under the Amies 1909 patents requiring the use of a liquefier.

The Warren license of the road company provided: "This license agreement only applies to mixtures of paving materials made under the Amies patents and the mixture so manufactured shall be laid cold." The Warren license only assumed to grant to the road company the right to make the paving material according to the Amies patents. It did not grant to the road company the right to make Warrenite.

In October, 1908, Dr. Amies experimented on the Magnolia road before applying for his 1909 patents. This is the experiment referred to in the 1910 pamphlet of the road company. Eastburn, a "quarry man and dealer in stone," co-operated with Dr. Amies in mixing the material at Stockton, N. J. Eastburn furnished the stone. Dr. Amies with his ideas for a "cold mix" superintend-

ed the mix. Albertson the road engineer for Camden county shared in laying the material on the Magnolia road in that county. Albertson was not produced as a witness. His paper, "An Experiment with Amiesite," read before the annual meeting of the New Jersey Engineers' Society, is much relied upon by the plaintiff. The relevant portion of the Albertson paper is:

"Our other experiment was with amiesite, a patented preparation made by coating the cold crushed stones, at the quarry, with a combination of solid asphalt, about sixty parts, and heavy asphalt oil, forty parts, mixed hot before applying to the stone in the concrete mixer. After the stones are coated about one-half bushel of hydrated lime is added to each cubic yard of the mixture, and the mixing continued. After each stone is thoroughly coated with the above compound, about one-half peck of dampened sand is added. This prevents the mass from adhering and becoming difficult to handle from the cars. The slight application of dampened sand just seems to be what is wanted to make the coated stone handle almost as freely as chestnut coal.

"Upon the ordinary clean, new macadam foundation of Evesham road, which was well rolled and solidified, we spread four inches of amiesite, prepared as above. We then rolled it, and the coated stones settled together in a tough, resilient pavement, ready for instant travel. Loaded wagons following within fifteen minutes of the spreading of the compound made no impression whatever.

"The most remarkable feature is that these coated stones have scarcely any adhesive qualities until they are spread cold and rolled, when they at once adhere to each other and form a perfect pavement."

Who furnished Albertson, the county engineer, with the information about the mixing at Stockton nowhere appears. Certainly he was not told by Dr. Amies to coat cold stone with solid asphalt 60 parts and heavy asphalt oil 40 parts. Albertson says the coated stones were spread and rolled cold and at once adhered and formed a perfect pavement. In other words he laid a "cold mix" pavement. It is clear that the process described by Albertson would not produce a "cold mix." It is certain that the mixing at Stockton followed a process that did produce a "cold mix."

I am convinced that two of the witnesses produced on behalf of defendant accurately characterized the above article of Albertson in Good Roads Magazine.

Hirzel, for many years in the city engineer's office in Wilmington, and since 1920 defendant's manager of production, who planned and built defendant's plants and trained and organized the crews at the plant, testified:

"RXQ561. In the Good Roads Magazine of April, 1909, entitled 'An experiment with Amiesite' by J. J. Albertson, County Engineer, Camden County, New Jersey, you recall that you testified that Dr. Albertson did not know what he was talking about or something to that effect. It is Plaintiff's Exhibit 128. There is no liquefier mentioned in that, I think we agreed? A. That would make me say that it is not Amiesite."

Fletcher, also an engineer and general manager of defendant or assistant since 1925, testified:

"XQ777. * * * I read from one of the exhibits in evidence, Plaintiff's Exhibit 128, it is the Good Roads Magazine, page 120 of April, 1909, by J. J. Albertson, County Engineer, Camden County, New Jersey: * * * Will you look in there and see if you can find any reference to a light volatile oil or a temporary liquefier and fixer? * * * A. I would say that the description of it was not accurate. The man who wrote it did not mean what he said.

"XQ780. But he called it Amiesite, did he not? A. He called it Amiesite, but it is impossible for him to put in solid asphalt and have it cooked with stones at all. * * *

"XQ787. Does he say anything about making it hot or heating it before putting it in a mixer? A. It would not be solid asphalt then and he says it is solid asphalt.

"XQ788. He is wrong one place or the other? A. I think he does not know what he is talking about.

"XQ789. If perchance he built a road that he called Amiesite, and that road was some good, he still did not know what he was talking about, I assume? A. That is true. There may have been a good road built there, and it might have been built by the Amiesite method, but I do not think he is actually describing the mix here. I do not think he knows much about it when he says he threw in solid asphalt in the mixer.

"XQ796. Suppose your assumption is not sound and that Dr. Albertson, the County Engineer of Camden County, New Jersey, built it, and it was built under his supervision, would your answer be the same? A. Yes, I do not believe that Engineer knew much

about it or he would not have described any paving product in that fashion.

"XQ797. But he did? A. He did, and it is quite a wild idea."

The knot of the case grows out of the testimony of Charles T. Eastburn, a witness for the plaintiff, in the stone business at Curwensville, Pa. This testimony is based upon the Albertson article. If Albertson is mistaken as to the mix at Stockton, Eastburn's whole testimony falls. He was testifying from recollection of an event that happened 25 years ago. He testified:

"Q11. * * * Now, have you any personal knowledge of the building of that road to which Albertson refers in that article? A. Yes, sir. Dr. Amies and I made the mix and I laid the road.

"Q16. You have examined Albertson's description of how that mix was made? A. Yes, sir.

"Q17. Is that substantially correct, from your recollection? A. Yes, sir.

"Q18. No liquefier was used in that mix at all? A. No, sir.

"Q32. I notice in that booklet [Good Roads 'Amiesite' issued by Amies Road Company in 1910] the following statement: 'Amies Road Company was chartered January 5, 1909 and sold during the year, 635,000 square yards, or over 95,000 tons.' Are those figures correct? A. Yes, sir.

"Q34. Will you state to me in what respect, or how the mixture with which those roads were made, compared with the Albertson mixture, which we have just been discussing? A. They were made after the Albertson mixture.

"Q35. You mean in the same manner? A. In the same manner.

"Q36. The whole 95,000 tons? A. Yes, sir.

"Q37. Did you use any liquefier at all in the year 1909? A. No, sir, we did not."

I am convinced that Eastburn is mistaken in his recollection of events of over a quarter of a century past. A fairly contemporary printed record is more reliable than a witness' recollection of remote events. In the pamphlet "Amiesite" "An Ideal Pavement at Low Cost," issued by Amies Road Company after 1916, reference is made to the road described by Albertson in his article published in Good Roads Magazine. The pamphlet states: "The Magnolia Road, Camden County, N. J. photograph of which is shown on the opposite page, was built during the summer of 1908 as an experiment. The method of manufacture and application was the same as that employed today." Eastburn was president of the company issuing this pamphlet which flatly contradicts his testimony. If the process of manufacture in 1916 was followed in 1908 it was certainly followed in the manufacture of the 95,000 tons in 1909.

As proof that the trade-name "Amiesite" antedated the patents plaintiff lays particular stress upon two experiments in Wilmington. In the summer of 1904, Thirteenth street between Market and King in Wilmington, Del., was paved by Dr. Amies. The minutes of the street and sewer department of Wilmington of August 2, 1904, record that "A delegation of ladies from 13th Street bet. Market and King Sts. were present asking that measures be taken to prevent the tar in the street paving on this street covering the surface of the street. Mr. Amies, the contractor, replied to the ladies, and the Board expressed its intention of taking measures to prevent a recurrence of the nuisance." The witness Pierson, then as now street commissioner of Wilmington, testified that he saw and at times helped Dr. Amies lay the pavement; that "the way he put that down was the most crude way that ever could be done." Years afterwards in a footnote of an advertising circular issued by Amies Road Company after 1916 it is stated "the material was made by hand on the street," referring to the paving job of 1904 on Thirteenth street. When asked what it was called, Pierson replied: "It did not have a name that I knew of." Again when asked, "So you are not certain as to whether it was called Amiesite as early as 1905 or 1906?" the witness replied, "I am sure it was not." In the annual statement of the street and sewer department for 1905 this paving is called "bituminous macadam pavement." It is perfectly apparent that the material at this early stage was not Amiesite either in character or in name.

In the following year, 1905, Dr. Amies laid another experimental strip or patch in Wilmington on Franklin street between Thirteenth and Pennsylvania avenue. The contemporary records of Wilmington show conclusively the name by which the pavement was then known. October 10, 1905, the Amies Asphalt Company by Joseph H. Amies, president, submitted the following offer:

"Philadelphia, October 4, 1905. To the Board of Directors of the Street and Sewer Department, Wilmington, Delaware. Gentlemen: The Amies Asphalt Company, in order

to demonstrate the efficiency and small cost of construction of the pavement known as Amies Asphalt Macadam, begs leave to make your Board the following offer: This company will grade and pave the intersection formed by 13th Street and Franklin Street, and the bed of Franklin Street between the northerly side of Pennsylvania and 13th Street, in the city of Wilmington, Delaware, being approximately 375 square yards, with the pavement known as Amies Asphalt Macadam.

"Upon the completion of the pavement and the approval by your Board, your department is to pay the cost of said paving less the cost of 100 square yards, provided the cost shall not exceed the sum of one dollar per square yard. Should the cost of said pavement exceed one dollar per square yard, such excess will be borne by this company.

"Inasmuch as we desire to lay this pavement as a sample pavement, we agree to contribute the aforesaid 100 square yards free of cost and guarantee that the cost of the entire pavement will not exceed the sum of one dollar per square yard. * * *

"On motion of Mr. Gray, the offer was accepted."

The only contemporary writing of any kind is the above minute of a contract reciting that this pavement was then known as "Amies Asphalt Macadam."

The witness Dow was asked when he first heard the term "Amiesite" used. He replied, "On the street in Wilmington here, in 1906, 13th Street and Pennsylvania Avenue." Later he was asked, "And that it was while you were there, that you heard some one use the name 'Amiesite'?" and the witness replied " 'Ameesite,' they pronounced it—more closely with Dr. Amies." In cross-examination the witness said:

"XQ5. Who did you hear in 1906 call that thing Amiesite? A. That I can not remember. Some one called across the street to me and said, 'This is Amiesite.'

"XQ6. Some unknown person? A. No; I knew him at the time, but I do not remember who it was.

"XQ7. A paving man, or just a person walking along the street? A. No; some one who was there to see the pavement laid.

"XQ8. How do you know that he was there to see the pavement laid? A. I was there for the same purpose; I think he was one of the engineers possibly connected with Mr. Amies' company.

"XQ9. What makes you think so? A. I have every reason to think so.

"XQ10. Just somebody on the street? A. Just somebody on the street, yes.

"XQ11. Do you know how that street was laid? A. Not exactly, no."

Dow was asked when he next heard of Amiesite. He testified: "There was literature published shortly after that, in which the word 'Amiesite' was mentioned. I can not remember as long back as that, when the next time was." After leaving the stand to find the literature the witness returned with the Albertson article in Good Roads Magazine for April, 1909, some months after application for the trade-mark "Amiesite." The witness was testifying of what he heard in Wilmington 25 years or more after the event. He was quite right in saying he could not remember so long back as to when he next heard the word Amiesite. He was mistaken about the literature being "published shortly after" the paving on Franklin street. It was published five years after. His memory of what he heard cannot be safely relied upon. In any event, it makes no difference what somebody may have called across the street that sounded like "Ameesite." At the time the pavement was known as "Amies Asphalt Macadam" and not Amiesite.

The only witness besides Dow having the hardihood to suggest that the experimental pavement laid by Dr. Amies in 1905 was at the time called Amiesite was Maloney. In 1905 the father of the witness was in the paving business in Washington and the witness was a schoolboy. When asked whether Amiesite has been a live type of paving in the District of Columbia during the period from 1905 to the present, the witness replied it had been for the last 8 or 10 years. When pressed as to the earlier period, the witness replied: "Previous to that time it was. I heard of it, but I did not hear of it as extensively as I do now, because I was not as familiar with the paving business; and in those days when I heard it, it was called to my attention by my father's pamphlet, which he had, and I was only going to school," etc. There was no pamphlet issued during this early period and the witness obviously was mistaken in his dates. No weight should attach to this testimony.

Plaintiff and its predecessor, Amies Road Company, published and circulated a large amount of promotion literature in exploiting Amiesite as a paving material in addition to that herein recited. In this literature they invariably used the name "Amiesite" as the name for this type of pavement. Also in their licenses they designated the pavement

as "Amiesite." They promulgated printed specifications and induced others to specify this pavement as "Amiesite." Prior to this controversy they nowhere stated that the name was applicable only to products made by themselves or their licensees. As a natural consequence the public adopted the word "Amiesite" as the name and the only name for this paving material, and have continued so to use it. Standard text-books describing pavements refer to Amiesite as a "known type of pavement." A publication entitled "Pocket Reference for Engineers," intended to clarify the terminology of the paving art, thousands of copies of which were circulated among members of the Asphalt Association, including the plaintiff, defined Amiesite as "a patented asphaltic concrete pavement." Specifications issued by cities and states frequently specify Amiesite under the name or title of "Amiesite." Others designate this pavement by symbols as, for example, in New York City where there is a specification "M M 3" and later "M M 4," and in Pennsylvania where "Specification E" is used. The symbols are used for the convenience of officials and to conform to the state's practice of avoiding the use of trade-names of proprietary or patented articles in asking for bids. Technical men in the paving art and the public understood the word "Amiesite" to be the proper and appropriate name of a particular pavement without reference to its source.

■ This case is clearly governed by a well-recognized principle of law. The right to the exclusive use of the trade-name of a patented article expires with the patent. The reason for the rule is that the patentee by retaining the distinctive name of the patented article prolongs the monopoly. A condition of the grant of a patent monopoly is the dedication to the public at the expiration of 17 years of the right to manufacture, use, or sell the patented process or product. Upon the expiration of the patent the patentee has agreed to dedicate to the public what theretofore was covered by his monopoly. If the public has a right to manufacture, use, and sell the article, but does not have the right to use the name by which it is known, the patentee is compelled to give and yet allowed to withhold at the same time. Singer Mfg. Co. v. June Mfg. Co., 163 U. S. 169, 16 S. Ct. 1002, 41 L. Ed. 118; Yale & Towne Mfg. Co. v. Ford (C. C. A.) 203 F. 707; Cheavin v. Walker, 3 Ch. Div. 850 (1877); Linoleum Mfg. Co. v. Nairn, 7 Ch. Div. 834 (1878); Kerly's Law of Trademarks and Tradenames, 43.

■ In accordance with the rule of law laid down in the case of Singer v. June Mfg. Co. the name "Amiesite," being the name of the type of pavement patented by Dr. Amies, became public property when the patents expired, and it is the defendant's right to continue to call paving material and pavements of that type by the accepted name "Amiesite" and to contract for them, manufacture them and sell them as "Amiesite," and to retain the name "Amiesite" as a part of its own corporate title.

The general principle is established in this circuit. In Yale & Towne Mfg. Co. v. Ford (C. C. A.) 203 F. 707, 709, Judge Buffington says: "To us it is clear the commercial value of a patent is the creation of a public desire for its product. And if the invention is such that its product has acquired a distinctive name, then the public, when its time of enjoyment comes, cannot enjoy to the full the freed invention, unless coupled thereto is the right to use the name by which alone the invented article is known. Nor is there injustice in this, for, when the real situation is analyzed, it will be seen that by enjoying the monopoly of his patent for a series of years the patentee impliedly agrees, as maker and seller of the invented article, that, when his patent expires, he will not only surrender to the public the mechanical right to duplicate the article, but also the distinctive name the public has appropriated to the patented article; for it is apparent that the public cannot use the invention to the full without having the incidental right to vend its product by the distinctive name which the public has given it. * * * The consideration which the public enjoys in return for the patent only begins when the patent expires, but, when it does expire, the invention and the designation by which, as a patented article, it has become known, passes into the general public right, subject, of course, to the limitation that the person who uses it shall so act as not to lead the public to believe that when buying such article they are buying one made by some other person, including, of course, the patentee. To that end, the law has required the article to be so marked with the maker's name or otherwise as shall prevent confusion and deception in this respect. How that marking shall be done is a matter for decision in each case. But, subject to such condition, which courts should in the interest of commercial morality efficiently enforce, the right of the public at the expiration of the monopoly to make and market the released article by the name it had acquired during the restricted period is unquestioned."

■ The plaintiff contends that the rule of the Singer Case does not apply where the use of the trade-name antedates the patent. Conceding that there may be an exception to the rule of the Singer Case, plaintiff's statement of such exception is not complete. The use of the name not only must antedate the patent, but it must further appear that the name and not the patent gave its value to the article. In other words, it must appear that the name had built up a recognized value as a trade-name by reason of an established commercial use prior to the patent. The proof in this case establishes that the trade-name "Amiesite" imparted no value to the paving material or pavement before the existence of the Amies patents. The proof overwhelmingly establishes that the exclusive use of the trade-name and the monopoly under the Amies patent were substantially contemporaneous. Patent monopoly and trade-name monopoly started and ended together. It necessarily follows that this case is not within the exception suggested by plaintiff, but is clearly within the rule of the Singer Case.

■ Plaintiff urges that to some witnesses the word "Amiesite" possessed a significance of origin denoting material manufactured by plaintiff or its licensees. To some extent this may be true. So long as a monopoly exists and an article is procurable from only one source the name of that article must become associated in the minds of some with the source from which alone it is procurable. This does not avoid the effect of public dedication on the expiration of a patent. It was so held in the Singer Case. Mr. Justice White explains that the word "Singer" "became not only the description of the machines, but also, in a subordinate sense, the indication of the source of manufacture." Nevertheless the right to the name passed to the public when the patents expired. So in this case the word "Amiesite" in addition to being an accepted name of the pavement may also, in a subordinate sense, have indicated to some the source of its manufacture. Nevertheless, when the patents expired the name became public property, for that is the difference between a trade-name annexed to a patented article and a trade-name used to designate an unpatented article. In the case of a patented article the patentee's seventeen-year monopoly affords the patentee an undue opportunity to have a particular name associated permanently and indelibly with the article. This would make possible the indefinite prolongation of a monopoly. Therefore the law will not protect the secondary sense at the expense of depriving the public of a word which they have become accustomed to use.

■ Until the end of the year 1930 defendant was licensed by plaintiff under the Amies 1909 patents and under certain later so-called improvement patents. These improvement patents proved of no value in the manufacture of Amiesite. Defendant did not avail itself of them. The patents of which defendant made use expired in the year 1926. When the defendant found that it was free to manufacture paving material without infringing any valid patents owned by the plaintiff, and also when it found that plaintiff's claim that it was about to obtain valuable improvement patents was not justified, defendant allowed its license to expire by limitation and ceased to pay royalties. Since December 31, 1930, defendant has had no contractual relations with the plaintiff.

Plaintiff claims that defendant is estopped from denying plaintiff's right in the trade-name "Amiesite." It is true that as long as defendant continued to pay royalties to the plaintiff either under patents or under alleged new and valuable applications for patents, defendant was estopped from denying the validity of the patents, trade-name or trade-mark. This was estoppel by contract. But such estoppel always comes to an end when the contractual relation comes to an end. All that defendant did was to pass on to the public assertions of rights which plaintiff was asserting against defendant. This ended on December 31, 1930. From that date defendant was free to assert that the word "Amiesite" is public property. From what defendant did, estoppel in pais does not arise. As licensee defendant endeavored to maintain rights which it now denies. This conduct did not lead plaintiff to change its position. Plaintiff's position was unaffected by defendant, and therefore there is no estoppel.

Since December 31, 1930, defendant has continued to manufacture Amiesite by the methods set forth and claimed in the Amies 1909 patents which expired in 1926. In thus manufacturing and selling Amiesite, defendant has always associated its own name with its product. It has not used the name "Amiesite" in any way calculated to create confusion with pavements manufactured by others. There has been no proof in this case that such confusion has occurred or is likely to occur.

■ Witnesses have testified to variations in the process of manufacturing the paving ma-

terial. The word "Amiesite" is a generic name for a type of pavement including many minor variations. All these variations were covered by the patents. These patents expired in 1926. The right to make this kind of pavement passed to the public and with it the right to call it by the generic name by which the plaintiff and its predecessors, as well as the public, had always designated it. The Singer Manufacturing Company made and sold a- large line of machines differing from each other in various ways, all under the name Singer. The Supreme Court held that this variation in the machine did not militate against the name "Singer" constituting a generic description of all the machines. "There can also be no doubt," says Mr. Justice White, "that the necessary result of the existence of these patents was to give to the Singer machines, as a whole, a distinctive character and form which caused them to be known as Singer machines, as deviating and separable from the form and character of machines made by other manufacturers. This conclusion is not shaken by the contention that as many different machines were made by the Singer Manufacturing Company, therefore it was impossible for the name 'Singer' to describe them all, because the same designation could not possibly have indicated many different and distinct things. The fallacy in the argument lies in failing to distinguish between genus and species."

■ Plaintiff suggests that where the invention is claimed as a process, as in this case, the doctrine of the Singer Case can only apply if the process is narrowly and exactly defined. No authority is cited for this statement. There is no sound reason to distinguish between a monopoly claimed under a process patent and a monopoly claimed under a machine patent. Most paving mixtures are patented in terms of the process which produces them. The monopoly thus obtained is as effective as though the patent attached to the product. The doctrine of the Singer Case applies.

Defendant contends that plaintiff was not manufacturing or trading in paving material with the right to protect a trade-name and trade-mark of the same, but that plaintiff was a holding company whose business was to hold stock, exploit patents, and issue licenses. From the licenses plaintiff paid salaries and dividends. Defendant further contends that the "services" rendered by plaintiff did not alter plaintiff's essential character as a nontrading company. Having decided that plaintiff's exclusive right to the use of the trade-name "Amiesite" expired with the patents in 1926, it is unnecessary to deal with this defense.

Little need be said on the question of trade-mark. To enjoy the maximum royalties from licenses of the patented process it was highly advisable to procure a trade-mark. So in 1908 Dr. Amies, along with the invention of his process, coined the trade-mark "Amiesite" by adding the suffix "ite" to his own name. January 23, 1909, Amies Asphalt Company filed in the United States Patent Office its application for registration as a trade-mark for this new paving composition the word "Amiesite" in script form with a paraph extending beneath the word from the final "e."

Plaintiff charges defendant with infringement in the use of this trade-mark. Defendant attacks the validity of the trade-mark on the grounds: (1) Whatever title there may have been to the mark was abandoned by plaintiff's remote grantor Amies Asphalt Company March 24, 1925, and that the subsequent renewal of the registration to that company four years after it had been abandoned was a nullity; and (2) plaintiff's effort to prove title to the trade-mark through so-called "services" to and "control" of its licensees is not supported in law or in fact. When defendant severed its contractual relations with plaintiff December 31, 1930, its letterheads, billheads, salesmen's cards, office windows, etc., carried the name "Amiesite" in the trade-mark form in which plaintiff had desired the word to be used by the defendant and plaintiff's other licensees. Six months before the filing of the present bill of complaint, and on advice of counsel, defendant about June 1, 1931, issued instructions that the use of the word "Amiesite" in script form with the paraph should cease and new stationery be procured and used not later than July 1, 1931. Thereafter, wherever the name in script form appeared the word "Amiesite" in plain type was substituted by the defendant and its letterheads, invoices, advertisements, office windows, etc., were changed. While there is some evidence that in some instances employees failed to strictly follow the above instructions, the instances are few and clearly due to inadvertence. There is no evidence that the use in the instances testified to were with intent to deceive or did deceive or injure the plaintiff or any one else. Further, it appears that the defendant has no desire or intention to return to the use of the old form of trade-mark. An examination and consideration of the voluminous proofs bearing upon the validity of

plaintiff's trade-mark would prolong unnecessarily this opinion, because the right of plaintiff to an injunction for trade-mark infringement is now a moot question.

Plaintiff is not entitled to an injunction restraining defendant from using the word "Amiesite" for its paving material or from contracting for and laying such pavement under the name "Amiesite" or from using the name "Amiesite" as part of its corporate title.

· The Counterclaim.

D'efendant's counterclaim rests primarily upon the defense that the word "Amiesite" passed into the public domain upon the expiration of the Amies 1909 patents. This contention has been sustained yet the question remains, whether defendant suffered loss or damage as the result of plaintiff's acts and whether the preliminary injunction granted at the conclusion of the trial should be made permanent and an accounting awarded? In support of the counterclaim defendant offered in evidence certain letters sent by plaintiff to road officials and road builders, prospective customers of defendant, stating in substance that defendant could not make or sell Amiesite and that those who bought defendant's product could be sued for infringement. Also, there is testimony of oral statements of plaintiff's salesmen to the same effect. Plaintiff undoubtedly believed that it had the exclusive right to the use of the trade-name and trade-mark "Amiesite." It prosecuted this suit to determine that right. In the absence of bad faith the plaintiff was warranted in sending the notices. The record does not establish bad faith. Any loss or damage suffered by defendant through the acts of the plaintiff is uncertain and speculative. Since the right to the use of the word "Amiesite" is determined in this case, the court will assume that plaintiff will be guided in its future conduct by the determination. The preliminary injunction to maintain the status quo which issued at the conclusion of the trial, and was operative "until the argument and determination of this cause or until the further order of this court," should be vacated.

Finally, I am satisfied that justice and equity require that the bill of complaint and the counterclaim should be dismissed, and that the costs should be divided between the parties, three-fourths to be paid by the plaintiff and one-fourth by the defendant.

■ This opinion contains a statement of the essential facts and applicable rules of law indicating the grounds of decision and complies with the provisions of Equity Rule 70½ (28 USCA § 723). American Can Co. v. M. J. B. Co. (D. C.) 52 F.(2d) 904.

A decree in accordance with this opinion may be submitted.