PROFESSIONAL GOLFERS ASSOCIA-
TION OF AMERICA,
Plaintiff-Appellee,

v.

BANKERS LIFE & CASUALTY COM-
PANY, Defendant-Appellant.

No. 74–2117.

United States Court of Appeals,
Fifth Circuit.

June 13, 1975.

Alan Meltzer, Lake Park, Fla., William T. Kirby, Chicago, Ill., for defendant-appellant.

William J. Dunaj, Miami, Fla., Stephen M. Sacks, William D. Rogers, Washington, D. C., for plaintiff-appellee.

Appeal from the United States District Court for the Southern District of Florida.

Before GEWIN, BELL and CLARK, Circuit Judges.

GEWIN, Circuit Judge:

The Professional Golfers' Association of America (PGA or the association) brought this suit for trademark infringement and unfair competition against its erstwhile associate in a golf club located at Palm Beach Gardens, Florida. Bankers Life and Casualty Company (Bankers) built the clubhouse and courses that housed the golf association's national headquarters for ten years. The collaboration was never extremely amicable, and final estrangement occurred in February of 1973 when the PGA vacated the premises for good. Bankers refused to remove the initials "PGA" from the title of its golf club after the association's departure. The present lawsuit fol-

lowed, and the district court found that Bankers had infringed the PGA's mark and competed unfairly with it through continued use of the initials. We find the district court's conclusions of law and fact eminently correct and therefore affirm.

Bankers and the PGA first considered working together in 1961, when the PGA desired more sumptuous headquarters than its abandoned supermarket and Bankers needed a selling ploy for its proposed new city. The parties entered into an agreement whereby Bankers would build two golf courses to PGA specifications and the PGA would construct the clubhouse to be used as its national headquarters. Bankers would have full use of the PGA name in its promotional activities for surrounding real estate development. By 1963, however, it was clear that the PGA lacked the financial resources to construct the proposed clubhouse, so Bankers, through its president McArthur, agreed to build the club as well as the golf courses. The second contract stated that the PGA would repay the cost of constructing the facility, $875,672.

Beset by continued monetary doldrums and a newly elected slate of officers who opposed the Palm Beach Gardens site, the PGA abandoned the partially constructed clubhouse/headquarters later that year. Litigation to force the association to live up to its contractual obligations ensued, and finally resulted in a 1964 settlement agreement that cancelled all prior contracts between the parties. As hereinafter discussed, the PGA agreed to rent space in the clubhouse for ten years, and the entire premises would continue to be known as the PGA National Golf Club. In return for the PGA's continued presence in Palm Beach Gardens, Bankers agreed to cancel the association's debt entirely. By this time the clubhouse had been constructed; permanent concrete buttresses on the outside of the building bore the PGA initials, and the controversial three letters were etched in a continuous horizontal line around the outer windows of the club.

This lukewarm symbiosis continued for eight years until the end of 1972 when Bankers announced the PGA had to vacate the premises immediately. Somewhat alarmed at the summary eviction, particularly in view of the winter tournaments and trade show it had scheduled for early 1973, the PGA finally cajoled Bankers into letting it remain until February 28, 1973. This reconciliation (of sorts) was evidenced by the fourth written agreement between the parties, an amendment to the 1964 instruments.

The PGA exited permanently once the winter tournaments were over, and Bankers thereafter changed the nature of the club. It was no longer open to PGA members whenever they wished to play, but became a private country club with the golf course available only to members and their guests. Bankers did, however, retain the PGA's acronym in renaming its facility the PGA Country Club.

Based on its ownership of the mark "PGA", the association brought this suit against Bankers for infringement, unfair competition, and breach of contract. The several questions presented on appeal are: (1) whether the owner of a collective service mark may license it to non-members, (2) if so, what were the terms of the license agreement between the PGA and Bankers, (3) whether Bankers infringed the PGA's mark or competed unfairly with the association, and (4) whether the district court committed prejudicial error in the manner in which it reached its findings of fact and conclusions of law. We shall treat these issues seriatim.

I. *Licensing of Collective Service Mark*

As one of seven registrations, the PGA owns a collective service mark in the configuration "PGA." Its application for registration explains that the mark is to be used in connection with golf instruction and entertainment in the nature of golfing exhibitions. Members display the mark in professional golf shops, at tournaments, and for the sale of services generally.

The Lanham Act defines a collective mark as a "trade-mark or service mark used by the members of a cooperative, an association, or other collective group or organization . . . ." 15 U.S.C. § 1127. A service mark, in turn, "means a mark used in the sale or advertising of services to identify the services of one person and distinguish them from the services of others." *Id.* Thus, a collective service mark such as "PGA" serves not to identify particular merchandise produced by members, but to guarantee the quality of service provided by members. Once registered, collective service marks are entitled to the same protection as other trademarks. 15 U.S.C. §§ 1053–4; *see* Boston Professional Hockey Association v. Dallas Cap and Emblem Manufacturing, Inc., 510 F.2d 1004 (5th Cir. 1975).

Bankers contends that the owner of a collective service mark has no authority to license it to anyone except members of the association. In essence it claims that an organization has the power to allow its members who have met certain qualifications to utilize the mark, but that it cannot authorize non-members to employ the mark for any purpose. We, however, are unable to discern any reason, based either in statutory construction or logic, why the licensing of collective service marks should be so limited.

First, the Lanham Act clearly contemplates that owners of collective marks and service marks receive the same treatment as holders of more orthodox trademarks. *See* 15 U.S.C. §§ 1053 and 1054, *supra.* Since merchandise marks have long been the subject of licensing arrangements, *see* 3 R. Callman, The Law of Unfair Competition, Trademarks and Monopolies § 78.2 (3d ed. 1969) (hereinafter Callman), the statute itself provides *no comfort for* Bankers' position. Secondly, though no court has explicitly passed on the question, decisions in other circuits have recognized that owners of collective marks may license non-members to use their marks. In Future Farmers of America v. Romack, 211 F.2d 925 (7th Cir. 1954),

the court held that both the national organization and the Texas chapter had the right to authorize a non-member to manufacture seals, emblems, and badges bearing the nationally-approved symbol "FFA." Similarly, the Second Circuit has acknowledged the Boy Scouts' right to license a single company to manufacture its official knives. Adolph Kastor & Bros. v. FTC, 138 F.2d 824 (2d Cir. 1943). Obviously, neither the emblem manufacturer nor the cutlery producer was a member of Future Farmers or the Boy Scouts. Bankers has asserted no policy in favor of its proposed rule, and this court can perceive none. Hence, we hold that the owner of a collective service mark may license non-members to use the mark under its aegis and subject to proper control.

## II. *Terms of License*

Bankers' second asserted error concerns the district court's interpretation of the several contracts entered into by the parties. As mentioned above, the 1964 settlement agreement states: "All prior agreements between the said parties . . . shall no longer be of force or effect, the said agreements are hereby cancelled and forever discharged, and the parties to said agreements are relieved of all responsibility thereunder." Despite Bankers' contention that its "perpetual" license stemming from the 1961 contract continued unabated, we believe the documented language demonstrates a definite, unequivocal desire to cancel the 1961 and 1963 contracts. Thus, our analysis begins with a construction of the October 30, 1964 settlement agreement and lease.

The settlement agreement sets out a number of reciprocal duties on the part of the respective parties. During the term of the lease the clubhouse and courses would be known as the "PGA National Golf Club." The PGA agreed to hold a number of official tournaments at the facility each year and to use its efforts to further development of the surrounding real estate. One crucial sentence states, "The terms of this

agreement shall terminate at the expiration of said lease or any extension thereof." The lease, in turn, contains a provision limiting its term to ten years. Reading the two instruments in conjunction, rudimentary principles of contract law demand the conclusion that under the 1964 agreements Bankers had the right to use the PGA name for only ten years.

■ The 1964 agreement and lease were expressly modified by amendments dated January 24, 1973, following the notice of eviction. Bankers claims that the circumstances surrounding the drafting of the amendments demonstrate that it had the right to continue using the PGA's collective mark perpetually. The initial draft of the 1973 agreement, as drawn by counsel for the PGA, contained a paragraph stating that Bankers would no longer use the designation "PGA" in reference to its golf club. Upon viewing said provision, the president of Bankers balked, telling his representative at negotiations to burn the agreement, that he refused to give up his "right" to the name. Negotiations between the parties and their respective counsel continued, and the final draft of the fourth agreement contained no reference to use of the name. At trial evidence as to intent of the parties conflicted. The executive secretary of the PGA said they finally reached an impasse and simply agreed to disagree with reference to Bankers' use of the mark. The president of Bankers and the chairman of the board of its golf club, however, stated that they thought the contract permitted Bankers to use the PGA name as part of their club's title. The trial court found that the parties agreed to disagree, and we are loathe to overturn such a credibility determination as clearly erroneous. There was sufficient evidence to support the trial court's finding.

The 1973 amendments changed the termination date of the earlier agreements from December 31, 1974 to February 28, 1973. Except for such explicit modifications, the 1964 agreements were to "remain in full force and effect."

Since we' have earlier held that Bankers' right to the name ended in ten years under the 1964 agreements, the 1973 amendments simply accelerated the date on which Bankers had to cease calling its club the "PGA National Golf Club" or "Home of the PGA."

Though the pertinent agreements at issue do not speak directly of a "license" to use the symbol "PGA", we think the clear import of the contracts bespeaks such an arrangement. The association expressed continued concern over use of the initials, and the 1964 agreement grants Bankers permission to use the designation for a limited time. Moreover, Bankers does not dispute the fact that it was a licensee. We therefore hold that the licensing arrangement between Bankers and the PGA expired February 28, 1973.

### III. *Infringement and Unfair Competition*

Our examination of the contracts at issue leads us to the third question presented on appeal: whether Bankers' continued use of the triple-lettered configuration "PGA" as part of the club's name infringes upon the association's registered mark. Ancillary to that issue is the question whether Bankers has competed unfairly with the PGA through such activities.

■■ Bankers submits that in order to find trademark infringement and/or unfair competition, this court must first determine that the parties compete. The argument assumes that trademark protection extends no further than to prevent a second user from utilizing the name or similar mark for goods or services substantially identical to those produced by the owner of the mark. The law of trademarks, however, is not so ossified, nor its protective scope so niggardly. This court has repeatedly held that direct competition is not the *sine qua non* of trademark infringement; rather the gist of the action lies in the likelihood of confusion to the public. Roto-Rooter Corp. v. O'Neal, 513 F.2d 44 (5th Cir. 1975); Beef Eater Restaurant,

Inc. v. James Burrough, Ltd., 398 F.2d 637 (5th Cir. 1968); Continental Motors Corp. v. Continental Aviation Corp., 375 F.2d 857 (5th Cir. 1967); Trail Chevrolet, Inc. v. General Motors Corp., 381 F.2d 353 (5th Cir. 1967); American Foods, Inc. v. Golden Flake, Inc., 312 F.2d 619 (5th Cir. 1963). As Judge Clark recently stated for this court in World Carpets, Inc. v. Dick Littrell's New World Carpets, 438 F.2d 482, 488 (5th Cir. 1971):

> Trademark jurisprudence, however, has long recognized that the lack of competitiveness is not always dispositive of the question of confusion and hence infringement. One such relationship where this is true exists when the sponsor or maker of one business or product might naturally be assumed to be the maker or sponsor of another business or product. The confusion evident in such cases is confusion of the business; the deceived customer buys the infringer's product in the belief that it originates with the trademark owner or that it is in some way affiliated with the owner. When this occurs, the infringer is unjustly trading on the true owner's established reputation. This is the precise wrong trademark legislation seeks to prevent.

Thus, falsely suggesting affiliation with the trademark owner in a manner likely to cause confusion as to source or sponsorship constitutes infringement. Tisch Hotels, Inc. v. Americana Inn, Inc., 350 F.2d 609 (7th Cir. 1965); Safeway Stores, Inc. v. Safeway Properties, Inc., 307 F.2d 495 (2d Cir. 1962); Volkswagenwerk Aktiengesellschaft v. Tatum, 344 F.Supp. 235 (S.D.Fla.1972); Wyatt Earp Enterprises v. Sackman, 157 F.Supp. 621 (S.D.N.Y.1958). Whether the public is likely to associate potato chips with dinner rolls of the same name, American Foods, Inc. v. Golden Flake, Inc., *supra,* a real estate business with a grocery chain of the same name, Safeway Stores, Inc. v. Safeway Properties, Inc., *supra,* or a restaurant with a well-renowned liquor bearing the same title, Beef Eater Restaurant, Inc. v. James Burrough, Ltd., *supra,* courts will enjoin the usurper's use of the mark.

◼ Here the PGA has demonstrated not only the likelihood of confusion, but some incidents of actual confusion. Members of the association have come to the club in the belief that they were still allowed to play there at any time, and the club has received several telephone calls intended for the golf association. *Cf.* World Carpets, Inc. v. Dick Littrell's New World Carpets, *supra;* Safeway Stores, Inc. v. Safeway Properties, Inc., *supra.* A former licensee cannot mislead the public into believing that its affiliation continues once the licensing arrangement has ceased. Heaton Distributing Co. v. Union Tank Car Co., 387 F.2d 477 (8th Cir. 1967). For once the contract ends, a licensee's right to the mark ends, and any subsequent use constitutes infringement. Callman, *supra* at 470.

◼ Since its inception in 1916, the PGA has expended considerable effort in promoting the game of golf. Members of the organization have displayed their skill throughout the country. Their success is due, at least in part, to the high standards the association demands of its professionals. In short, the PGA has established a reputation for consummate skill and excellent entertainment in the world of golf. Bankers long enjoyed the benefit of that reputation while it housed the association's national headquarters. Official tournaments were held in Palm Beach Gardens and PGA officials appeared in advertisements for the residential development. But once the PGA left the premises, Bankers' right to bask in the golfing association's good name ceased. The PGA established that the public would likely continue to associate the club with the organization so long as the facility bore the title "PGA Country Club," or any similar designation containing the three initials.

Though there is no indication in the record that Bankers has maintained the greens or clubhouse in an unsightly fashion, so as to tarnish the PGA's reputation, the association should not have to rely on such good faith in the future. "[F]or a reputation, like a face, is the symbol of its possessor and creator and

another can use it only as a mask." Yale Electric Corp. v. Robertson, 26 F.2d 972, 974 (2d Cir. 1928) (L. Hand, J.). The quality of a trademark owner's reputation should lie within his own control.

▮▮▮ Having determined that Bankers' activities bear all the earmarks of trademark infringement, we have only to discuss appellant's remaining alternative theory: that the PGA abandoned its mark through "naked licensing", or the failure to properly supervise its licensee's use of the mark. We note, first, that a licensee is estopped to contest the validity of the licensor's title during the course of the licensing arrangement. Heaton Distributing Co. v. Union Tank Car Co., *supra;* Donald F. Duncan, Inc. v. Royal Tops Manufacturing Co., 343 F.2d 655 (7th Cir. 1965); Pacific Supply Coop v. Farmers Union Central Exchange, Inc., 318 F.2d 894 (9th Cir. 1963); E. F. Prichard Co. v. Consumers Brewing Co., 136 F.2d 512 (6th Cir. 1943). The licensee has, by virtue of the agreement, recognized the holder's ownership. Yet once the license has terminated, the question remains whether the former licensee is forever barred from challenging the holder's valid ownership. Some courts have held that the estoppel expires with the license. Donald F. Duncan, Inc. v. Royal Tops Manufacturing Co., *supra;* Bucky v. Sebo, 208 F.2d 304 (2d Cir. 1953); Eskimo Pie Corp. v. National Ice Cream Co., 26 F.2d 901 (6th Cir. 1928); Amiesite Asphalt Co. v. Interstate Amiesite Co., 4 F.Supp. 504 (D.Del.1933). Others have refused to allow any subsequent challenges by former licensees. Heaton Distributing Co. v. Union Tank Car Co., *supra;* E. F. Prichard Co. v. Consumers Brewing Co., *supra.* We, however, under the facts and in the circumstances here presented, adopt an intermediate view, that suggested by treatise author Rudolf Callman: after expiration of the license, a former trademark licensee may challenge the licensor's title on facts which arose *after* the contract has expired. Callman, *supra* at 454; Medd v. Boyd Wagner, 132 F.Supp. 399 (N.D.Ohio 1955). Thus a licensee affirms his licensor's ownership of the mark by entering into the agreement, but the straightjacket effect does not last interminably. In the present case, however, the facts upon which Bankers relies [1] arose during the course of its ten-year agreement with the PGA, so it is estopped to argue abandonment.

▮▮▮ The PGA's pendent unfair competition claim succeeds for many of the reasons supporting its infringement action. Again, likelihood of consumer confusion and passing off one's goods or services as those of another constitute the gravamen of the action. Sun Coast v. Shupe, 52 So.2d 805 (Fla.1951); Feller v. Broward Hurricane Panel Co., 196 So.2d 7 (Fla.App.1967); Stagg Shop of Miami v. Moss, 120 So.2d 39 (Fla.App. 1960). Unfair competition, however, is a more broadly conceived tort than its frequent litigation partner, trademark infringement, and there are some instances where a defendant is guilty of competing unfairly without having technically infringed. B. H. Bunn Co. v. AAA Replacement Parts Co., Inc., 451 F.2d 1254 (5th Cir. 1971). For "[t]he law of unfair competition is the umbrella for all statutory and nonstatutory causes of action arising out of business conduct which is contrary to honest practice in industrial or commercial matters." American Heritage Life Insurance Co. v. Heritage Life Insurance Co., 494 F.2d 3, 14 (5th Cir. 1974). In the present case, however, the facts underlying both actions coalesce. Bankers sought to "pass off" its club as affiliated with the PGA, thereby trading on the PGA's reputation. Hence its actions violate not only federal, but state law.

---

1. Bankers claims that the PGA did not supervise its use of the mark to any appreciable extent during the period Bankers ran the club. The PGA, on the other hand, asserts that it required Bankers to keep the green and clubhouse in "first class" condition and to employ a golf professional who belonged to the PGA.

## IV. Adoption of Findings of Fact and Conclusions of Law

■ Finally, Bankers complains of the manner in which the trial court reached its ultimate conclusions of law and fact. It asserts the court erroneously adopted appellee's proposed findings of fact and conclusions of law verbatim without opportunity for objections or a hearing. More specifically, Bankers claims that the written finding to the effect that the parties "agreed to disagree" as to continued use of the name in the January 24, 1973 agreement was improper, because unsupported by the court's independent determination.

One crucial factor distinguishes this case from other decisions in which we have disapproved the uncritical acceptance of the winning party's proposed findings. See, e. g., Keystone Plastics, Inc. v. C & P Plastics, Inc., 506 F.2d 960 (5th Cir. 1975); Williamson-Dickie Mfg. Co. v. Hertex, Inc., 504 F.2d 983 n. 5 (5th Cir. 1974); Railex Corp. v. Speed Check Co., 457 F.2d 1040 (5th Cir. 1972); Louis Dreyfus & Cie. v. Panama Canal Co., 298 F.2d 733 (5th Cir. 1962). The district judge in this case made oral findings of fact and conclusions of law from the bench at the end of trial. In addition, he questioned counsel for Bankers extensively during the course of closing argument, manifesting a commendable knowledge of the phraseology of the several contracts at issue. Following his oral disposition, the court instructed counsel for the PGA to prepare proposed findings in accordance therewith.

The proposed findings incorporated the court's oral conclusions as well as some of the reasoning apparent in its earlier questions. During Bankers' closing argument concerning construction of the final instrument, Judge Fay explicitly asked counsel, "You do not think one alternative would be that they agree to disagree?"[2] His oral conclusion that Bankers never enjoyed a license to the name in perpetuity was necessarily based on the assumption, indicated a few minutes before, that the parties had agreed to disagree. The PGA's inclusion of that fact as a finding of the court, therefore, was not improper; it was based on the trial judge's independent credibility choice.

The court adopted the PGA's proposals almost immediately, without receipt of opposing counsel's objections. Once objections were submitted a few days later, the court denied them without modifying its earlier judgment. Though this court has recently recommended a hearing procedure for the airing of all possible objections prior to the adoption of proposed findings of fact and conclusions of law, the judgment in the instant case demonstrates conclusions distilled in the "crucible of [the district judge's] conscience." Keystone Plastics, Inc. v. C & P Plastics, Inc., supra. The trial court entered lengthy oral findings. Substantially all written objections later advanced by appellant had been presented to the court at some point during the trial. When the court received appellant's objections, it had the power to amend, modify, or change its findings. We cannot presume the district court did not consider the objections solely because it did not grant them.

■ Moreover, the scope of appellate review does not change simply because we disapprove the manner in which the district court arrived at its findings of fact and conclusions of law. We are bound by the clearly erroneous rule in reference to factual determinations. Ag Pro, Inc. v. Sakraida, 474 F.2d 167 (5th Cir. 1973). As heretofore explicated, none of the district court's factual or legal conclusions were erroneous.

We note in closing that the district court's permanent injunction restrains Bankers from using the terms "PGA", "Professional Golfers' Association", or "Professional Golfers' Association of America" in reference to any golf facilities it owns, whether on entrance signs, literature or other forms of advertising. The decree, however, does not require

**2.** Record at 185.

Bankers to dismantle any permanent appurtenances to the clubhouse, and Bankers may denominate its club "former home of the PGA" if it wishes. The court's oral findings further state that there is no necessity for changing the real estate plats that refer to "PGA National Golf Club Estates." We believe the trial court has properly exercised its equitable powers in fashioning a decree that is fair and not too burdensome. The judgment of the district court is therefore affirmed.