**WESTCAP GOVERNMENT SECURI-
TIES, INC., Plaintiff-Appellant,**

v.

**HOMESTEAD AIR FORCE BASE
FEDERAL CREDIT UNION, et
al., Defendants-Appellees.**

No. 81–5320.

United States Court of Appeals,
Eleventh Circuit.

Feb. 10, 1983.

Britton, Cohen, Kaufman, Benson &
Schantz, J. Robert Olian, Miami, Fla., for
plaintiff-appellant.

Baskin & Sears, Michael T. Greif, Miami,
Fla., for defendants-appellees.

Before   TJOFLAT,   CLARK   and
MILLER *, Circuit Judges.

TJOFLAT, Circuit Judge:

Westcap, a Texas corporation (known as
Hibbard & O'Connor Government Securi-
ties, Inc. when this litigation commenced),
sued Homestead Air Force Base Federal
Credit Union (the "Credit Union") and its
officers and directors in the district court
alleging federal securities law violations,
breach of contract, and common law fraud
and deceit.[1] The material facts were not
disputed, and both sides moved for summa-
ry judgment. The district court, after

---

* Honorable Jack R. Miller, U.S. Circuit Judge for
the Federal Circuit, sitting by designation.

1. Although the district court made no jurisdic-
tional findings, its disposition of the case com-
pels us to note that our jurisdiction is founded
on 28 U.S.C. § 1332 (1976), diversity of citizen-

ship. The district court treated the federal se-
curities claims (and the common law fraud and
deceit claims) as frivolous, and did not mention
them in granting summary judgment on the
breach of contract count. Plaintiff abandoned
these claims on appeal, and we do not consider
them. Since there is no basis for pendent juris-

hearing argument, entered summary judgment for the Credit Union, and Westcap appeals. We reverse, grant summary judgment in favor of Westcap on its breach of contract claim against the Credit Union, and remand to the district court for further proceedings limited to the issue of damages.

I.

On December 1, 1977, the Credit Union signed a commitment letter agreeing to "stand by" to purchase $500,000 of Government National Mortgage Association (GNMA) Mortgaged Backed securities from Westcap at an 8% rate of interest, on November 20, 1978. Delivery of the securities, under the contract, was optional for the seller, Westcap, but, if Westcap exercised its option, the contract provided that "[d]elivery must occur November 20, 1978." In return for agreeing to buy fixed interest rate securities from Westcap almost one year in advance, at Westcap's sole option, the Credit Union accepted a non-refundable commitment fee of $2,500.[2]

In accordance with the contract, Westcap gave notice by letter of October 11, 1978, and telegram of October 12, 1978, of its intent to deliver approximately $500,000 of GNMA securities for settlement on November 20, 1978. The letter also stated that "[f]inal figures and settlement instructions will be provided prior to that date." The Credit Union acknowledged receipt of this notification by returning a signed copy of the letter to Westcap.

On November 20, the Credit Union borrowed the funds necessary to purchase the securities at 10.25% interest per annum and deposited the money in its non-interest bearing checking account, although final figures and settlement instructions had not yet arrived. Having received no communication from Westcap pertaining to the transaction, the Credit Union transferred the $500,000 earmarked to purchase the securities to an interest-bearing account on November 24. On November 28, it arranged to repay the loan, and wrote Westcap the following letter:

> Pursuant to your letters of October 11, 1978, and December 1, 1977, this is to inform you that as of this date, we have not received either $500,000 of the GNMA Securities nor final figures for settlement instructions.
>
> It is our understanding that delivery was mandatory on or before November 20, 1978. Since this has not been accomplished, we hereby notify you that we do not wish to proceed due to your failure to comply with our agreement. We will retain the $2,500 as liquidation damages pursuant to your December 1, 1978 [sic] letter.

Because its dealer was late in getting the securities to it, Westcap did not present the bonds for payment by the Credit Union until November 28, 1978. On that date, Westcap mailed a customer confirmation to the Credit Union, with a settlement date of November 20, 1978, and an entry date of November 28. The General Manager of the Credit Union stated in a deposition that he received this written confirmation on December 1, 1978, and returned it in a letter dated December 5. After failing to persuade the Credit Union to accept delivery of

---

diction of the state law contract claim, *see United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), we lack jurisdiction unless there is diversity of citizenship.

The complaint alleges that Westcap is a Texas corporation, the individual defendants are Florida citizens, and the Credit Union is a federally chartered cooperative located in Dade County, Florida. Since the Credit Union did not dispute these allegations, we assume that its activities are sufficiently localized to render it a Florida citizen for diversity purposes. *See Feuchtwanger Corp. v. Lake Hiawatha Fed.*

*Credit Union,* 272 F.2d 453, 455–56 (3rd Cir. 1959) (localization of activity of a federally chartered credit union to one area of New Jersey held sufficient to make it a New Jersey citizen for purposes of establishing diversity jurisdiction.)

2. Apparently the Credit Union gambled that interest rates would remain stationary, or at least not rise enough to offset the $2500 payment received; Westcap, on the other hand, hoped that interest rates would rise sufficiently to offset the $2500 fee it paid the Credit Union to bind itself to the seller's option contract.

the securities, Westcap sold them at a loss on December 8. It seeks to recover that loss in this litigation.

## II.

Neither party disputes that the option contract at issue here was valid and enforceable at law in an action for damages. They dispute only the legal significance of the contractual provision that "[d]elivery must occur November 20, 1978." The Credit Union argues that delivery was mandatory on November 20, that Westcap failed to deliver the securities on that date, and that this failure entitled it to terminate its contract and keep the commitment fee as liquidated damages. Westcap asserts that as a matter of law it delivered on time,[3] and, even assuming arguendo that it did not, its tardiness did not entitle the Credit Union to terminate the agreement.

Florida law governs this dispute. *See Erie R.R. Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and note 1 *supra.* Assuming arguendo that Westcap did not deliver until November 28, we conclude that any breach which may have occurred was not material to the performance of the contract. The Credit Union's attempt, without notice to Westcap, to terminate the contract unilaterally is without legal justification, and Westcap is entitled to summary judgment.

Initially, we note that the pleadings and record are silent concerning any damages the Credit Union may have suffered as a result of Westcap's tardy performance. At oral argument, counsel for the Credit Union first asserted that damages were immaterial, and then claimed that the Credit Union lost interest on the $500,000 it borrowed at 10.25% per annum for the four days this money remained in a non-interest bearing account. The record contains no pleading or proof of this claim, and counsel could not deny that the Credit Union, had it elected to go through with the transaction, would have received interest on the GNMA securities starting from the settlement date of November 20, regardless of the date physical delivery of the securities occurred. Counsel then conceded that damages "could have been minimal."[4]

In this context, we analyze the Credit Union's claim that the phrase "[d]elivery must occur on November 20, 1978" renders time of performance an essential term of the contract under Florida law. Although the word "must" strongly suggests that delivery was mandatory on that date, there is no language in the contract suggesting that time of delivery was an essential element of plaintiff's performance. It is evident that the parties did not negotiate or bargain about the date of delivery, and did not discuss the legal consequences or remedies if delivery did not occur on the agreed-upon date. Indeed, neither the contract nor the parties give any reason for the use of the mandatory language.

Interpreting Florida law, this circuit has held "it is elementary that the mere breach of an agreement which causes no loss to plaintiff will not sustain a suit by him for damages, much less rescission." *Block v. West Palm Beach,* 112 F.2d 949, 952 (5th Cir.1940) (citation omitted) (affirming dismissal for failure to state a claim in suit by

---

**3.** This argument is based on an interpretation of Fla.Stat. § 678.313 (1981), the portion of the Florida Uniform Commercial Code governing the date of delivery of investment securities to a purchaser. Our disposition renders a resolution of this issue unnecessary.

**4.** Westcap argues convincingly that the reason the Credit Union terminated the contract was the rise in interest rates in the period between the signing of the contract and the date of delivery of the securities. These rising interest rates meant that the Credit Union had made an unprofitable investment; this, Westcap argues, and not the eight-day delay in delivery, was the

reason the Credit Union refused to proceed with the transaction.

 The record fully supports this conclusion. Phillip Richardson, the general manager of the Credit Union at the time of the events in question, stated in his deposition that the transaction was not in the best interest of the Credit Union because "there would have been a loss on the securities." 1st Supp. Record, vol. 1, at 16. When asked "if you would have been able to make a profit, would you have accepted the securities?", Richardson replied "More than likely, yes." *Id.* at 16–17.

bondholders against city for breach of contract when bondholders made no showing of injury from city's breach of promise). Concerning tardy performance that does not cause damage to the complaining party, a Florida appellate court has observed,

> The modern trend of decisions concerning brief delays by one party in performance of a contract or conditions thereunder, in the absence of an express stipulation in the contract that time is of the essence, is not to treat such delays as a failure of a constructive condition discharging the other party unless performance on time was clearly an essential and vital part of the bargain.

*National Exhibition Co. v. Ball,* 139 So.2d 489, 492 (Fla.Dist.Ct.App.1962). In applying this general trend in contract law to land sales agreements, the court reasoned:

> time is not of the essence for the reason that no substantial injury will normally result from the breach of a time term and it is therefore just to enforce the contract with due allowance for any damage rather than to discharge the party aggrieved by the failure to perform strictly on time.

*Id.* (citation omitted). Minor delay has also been held not to be a basis for rescission in the context of construction contracts. *See Larsen v. Miami Gardens Dev. Corp.,* 299 So.2d 50 (Fla.Dist.Ct.App.1974).

In *Blaustein v. Weiss,* 409 So.2d 103 (Fla. Dist.Ct.App.1982), the court surveyed Florida contract law and found that time should be considered of the essence in three circumstances: (1) where there has been an express recital by the parties; (2) where the treating of time as a non-essential would produce a hardship, and delay by one party in completing or in complying with a term would necessarily subject the other party to a serious injury or loss; and (3) where an express notice has been given by a party not in default to the other party who is in default, requiring the contract to be performed within a stated time, which must be a reasonable time according to the circumstances. Finding none of the circumstances applicable, the court refused to find time of the essence of the contract.

The Credit Union seeks to equate the clause requiring delivery on a date certain with an express stipulation that time is of the essence of the contract. Assuming arguendo that this is such a stipulation, Florida law still would not permit unilateral termination of the contract. In *Jackson v. Holmes,* 307 So.2d 470 (Fla.Dist.Ct.App.), *cert. denied,* 318 So.2d 404 (Fla.1975), the contract in question specified that a buyer's bank loan certification was due on or before November 24 and stipulated that time was "of the essence of the agreement." The loan certification was not forthcoming until December 20, and the seller refused to proceed. The court granted specific performance notwithstanding the failure to furnish certification on time. The court first noted the trial court's finding that "[t]here was no injury to the [sellers] in failing to have the technical loan certification on the date specified and no hardship of any type resulted therefrom to the [sellers]." 307 So.2d at 471. Rejecting the seller's argument that the "time is of the essence" provision justified their refusal to proceed, the court stated "where the failure to perform is not substantial, the non-performing party should not be deprived of his rights unless it appears from the contract that this was clearly contemplated by the parties." *Id.*

We hold that, in the absence of any showing of damages, Florida law does not countenance the Credit Union's unilateral termination of its contract to purchase securities from Westcap. Indeed, its conduct after the alleged breach on November 20, 1978, was inconsistent with its theory of rescission. First, instead of returning the benefits it had received from Westcap from the latter's performance of its part of the contract, the Credit Union kept the $2,500 commitment fee as "liquidated damages." *See Crown Ice Machine Leasing Co. v. Sam Senter Farms,* 174 So.2d 614, 617 (Fla.Dist. Ct.App.), *cert. denied,* 180 So.2d 656 (Fla. 1965) (party seeking rescission should offer to restore benefits received to the party furnishing them). It did this despite its absolute inability on appeal to demonstrate that it suffered any damages whatsoever

from Westcap's allegedly tardy delivery. Second, the Credit Union did not give any notice to Westcap after November 20 that it would insist on delivery as specified or it would terminate the contract. *See Realty Sec. Corporation v. Johnson,* 93 Fla. 46, 111 So. 532, 534–35 (1927) (even in a contract containing "time is of the essence" provision, vendor must give reasonable notice of intent to terminate where payment is not made at time provided in the contract). Rather than giving notice of an intent to terminate, the Credit Union seized upon Westcap's slight delay in delivery as an excuse to extricate itself from an otherwise unprofitable agreement.

■ Since there is no dispute that the initial contract was binding and enforceable at law in an action for damages, and since there is no excuse for the Credit Union's failure to perform,[5] we reverse and remand the case to the district court for the entry of judgment for Westcap against the Credit Union on the issue of liability, and for the determination of Westcap's damages. As for Westcap's claims against the Credit Union officers and directors, the judgment of the district court is affirmed.[6]

AFFIRMED in part; REVERSED in part; and REMANDED with directions.

---

**5.** In a footnote to the conclusion of its brief, the Credit Union argues the court is precluded from entering summary judgment against it by the existence of genuine issues of material fact pertaining to an affirmative defense that Westcap violated the federal securities laws. However, the Credit Union fails to allege, let alone demonstrate, that the alleged securities law violations have anything whatsoever to do with this proceeding; the record reveals only that the S.E.C. brought a civil suit against Westcap seeking an injunction against sales practices allegedly in violation of the securities law. Record, vol. 1, at 162–63. The Credit Union does not attempt to demonstrate the relevance of that S.E.C. proceeding to this action. The mere allegation that Westcap entered into the contract with reason to believe that it would not be able to deliver the securities promptly is insufficient to prevent entry of summary judgment. The only evidence in the record on this point, the uncontroverted affidavit of Westcap Vice President and General Counsel William Stewart, refutes this claim: "we did not present the bonds for payment until November 28, 1978, for the reason that the dealer delivering to us was late getting the pool information to our Shipping Department." Record, vol. 1, at 92.

**6.** Westcap has made no showing as to why these individual defendants should be liable for the Credit Union's breach of contract.