710 F.2d 1480
 219 U.S.P.Q. 693
 BURGER KING CORPORATION, Plaintiff-Appellee, Cross-Appellant,
v.
Gerald A. MASON, et al., Defendants-Appellants, Cross-Appellees.
BURGER KING CORPORATION, a Florida Corporation,
Plaintiff-Appellee, Counter- Defendant, Cross-Appellant,
v.
Gerald A. MASON, et al., Defendants-Appellants,
Counter-Plaintiffs, Cross- Appellees.
 Nos. 82-5066, 82-5803.
 United States Court of Appeals,
Eleventh Circuit.
 Aug. 1, 1983.
 
 Edward A. Kaufman, John T. Kinsey, J. Robert Olian, Britton, Cohen, Kaufman, Benson & Schantz, Miami, Fla., for Mason, et al.
 Andrew C. Hall, Richard F. O'Brien, III, Hall & O'Brien, Miami, Fla., Mayer, Brown & Platt, Lee N. Abrams, Mark McLaughlin, Chicago, Ill., for Burger King Corp.
 Appeals from the United States District Court for the Southern District of Florida.
 Before VANCE and HENDERSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.
 ALBERT J. HENDERSON, Circuit Judge:
 
 
 1
 Following approximately five years of litigation in the United States District Court for the Southern District of Florida encompassing two jury trials, one bench trial and countless motions and hearings, the appellants, a group of investors including Gerald Mason, Wesley Hardy, Donald Szabo and Richard Peterson (hereinafter collectively referred to as "Mason") by this appeal, seek to reverse portions of the final judgment. The Burger King Corporation ("BKC"), the original plaintiff in the action, filed a cross-appeal to certain adverse rulings of the district court. Mason also filed a separate appeal from the attorney's fee award and BKC again cross-appealed on this issue. After an exhaustive review of the evidence and each assignment of error, we affirm in part and remand in part for further proceedings.
 
 I. Introduction
 
 2
 BKC, one of the largest franchisors of fast-food restaurants in the United States, maintained a business relationship with Mason for many years. As a result of this relationship, Mason acquired the right to establish Burger King restaurants in two major metropolitan areas and to develop other restaurants throughout the United States during the 1970's. Mason's territorial rights derived from two development agreements between the parties by which Mason obtained the exclusive authority to establish Burger King franchises in Pittsburg and Kansas City. Over the years Mason purchased at least twenty-seven Burger King franchises under separate agreements. In connection with the development of some of the franchises, BKC provided financing to Mason for which Mason executed promissory notes. Mason incurred additional obligations for payments due under certain lease agreements with BKC, for supplies furnished on account and for royalties due under the franchise agreements. (The leases, accounts for supplies and royalties will be referred to as the "accounts".)
 
 
 3
 The long standing Mason-BKC business association began to deteriorate in 1977 when BKC notified Mason of the cancellation of the two exclusive development agreements. In 1978, BKC filed this suit seeking a declaration that it had properly terminated the development contracts. Mason responded with a counterclaim for reinstatement and damages for the revocation. Afterwards, in 1979, BKC informed Mason that it was unilaterally terminating all twenty-seven of its Burger King franchises for failure to comply with the terms of the franchise agreements. Eventually, through amendments to the complaint and counterclaim, the suit filed in 1978 expanded to controversies concerning both the development and franchise agreements as well as demands arising from Mason's liability on the promissory notes and the accounts.
 
 
 4
 In 1980 the case came on for trial and the issues were submitted to the jury on special interrogatories. The jury found that the development contracts were validly cancelled but that BKC wrongfully terminated twelve of the franchise agreements. Because of the equivocal nature of the jury's verdict as to the remaining fifteen franchise terminations, the district court ordered a new trial on those agreements. The court also granted a new trial to BKC for a computation of damages resulting from Mason's liability on the promissory notes and accounts. Since there was no genuine issue of fact as to the amount due on the promissory notes and accounts, the district court thereafter entered a summary judgment in favor of BKC for those damages. Before the second jury trial, BKC conceded its error in terminating one of the fifteen franchises left for trial. Also, during the second trial, the district court sustained, as a matter of law, the revocation of seven of the franchises. Thus, by concession or court order, eight of these fifteen terminations were eliminated from the jury's consideration. After the second trial in 1981, the jury found that BKC validly terminated six of the remaining franchises. Consequently, Mason prevailed in its efforts to nullify the terminations of fourteen of its franchises and BKC successfully defended the cancellation of thirteen franchise agreements.
 
 
 5
 Subsequent to the second jury trial, the district court held a bench trial on BKC's claims for common law trademark infringement, unfair competition and breach of the franchise agreements based upon Mason's post-termination use of the Burger King trademarks. The court awarded to BKC the profits earned from the franchises previously found to have been lawfully terminated for the breach of the franchise agreements.
 
 
 6
 Finally, the district court conducted a hearing on BKC's application for attorney's fees. The court awarded fees in accordance with the provisions of the development agreements, the notes, the leases and a Florida statute.
 
 II. The 1980 Jury Verdict
 
 7
 In attacking the trial judge's resolution of the 1980 jury verdict, Mason challenges the grant of a new trial limited to the issue of BKC's damages on the promissory notes and the accounts. Second, Mason asserts that the district court also erred in ordering a new trial for a determination of the validity of BKC's cancellation of the franchises not listed on the jury's verdict form.
 
 
 8
 A. Did the jury compromise?
 
 
 9
 In its answer to Special Issue # 1, the jury found in favor of BKC on the promissory notes (valued at approximately $1,000,000.00), rejecting Mason's affirmative defenses thereto.[1] However, it awarded BKC only $1.00 as damages. Responding to Issue # 2, the jury sustained BKC's right to recover on the accounts (valued at approximately $500,000.00) and found against the affirmative defenses. BKC was awarded $100,000.00 as "damages" for this item.
 
 
 10
 Neither party brought these inconsistent results to the district court's attention until after the jury had been discharged and it was too late to resubmit the damages question to the jury. BKC eventually filed a motion for a clarification of the jury verdict on the promissory notes and the accounts. By this motion, BKC sought a judgment for the face amount of the debts, as shown by the evidence, plus the "damages" awarded by the jury. Alternatively, BKC moved for a judgment notwithstanding the verdict for the full amount of the obligations. The district court denied both motions and, instead, ordered a new trial limited to a computation of BKC's damages on the promissory notes and the accounts. Subsequent to this order, BKC filed a motion for summary judgment supported by affidavits establishing its entitlement to the full amount of the debts. Since Mason submitted no evidence in opposition to the affidavits, the district court granted judgment to BKC for these liquidated amounts.
 
 
 11
 Mason contends that the jury's inadequate award of damages signifies an improper compromise verdict because there was no dispute as to the correct amount due on the notes and accounts. Mason therefore claims that the liability and damages issues were inseparable and the trial judge erred in restricting a new trial to the question of damages.
 
 
 12
 Rule 59(a) of the Federal Rules of Civil Procedure provides that a new trial may be granted "on all or part of the issues." The decision whether to grant a new trial is discretionary with the district court and will not be reversed absent an abuse of that discretion. See, e.g., Franks v. Associated Air Center, Inc., 663 F.2d 583, 586 (5th Cir.1981); Lucas v. American Manufacturing Co., 630 F.2d 291 (5th Cir.1980);[2] Young v. International Paper Co., 322 F.2d 820, 822 (4th Cir.1963).
 
 
 13
 It is axiomatic, however, that a partial new trial may not be granted if it would infringe upon a litigant's seventh amendment right to a jury trial. In Gasoline Products v. Champlin Refining Co., 283 U.S. 494, 51 S.Ct. 513, 75 L.Ed. 1188 (1930), the Supreme Court enunciated the standard which governs partial new trial practice:
 
 
 14
 [w]here the practice permits a partial new trial, it may not properly be resorted to unless it clearly appears that the issue to be retried is so distinct and separable from the others that a trial of it alone may be had without injustice.
 
 
 15
 Id. at 500, 51 S.Ct. at 515, 75 L.Ed. at 1191. Applying Champlin Refining, the former Fifth Circuit Court of Appeals held that a jury verdict influenced by an improper compromise cannot stand and a complete new trial is required because liability and damages are inseparable. See, e.g., Lucas v. American Manufacturing Co., 630 F.2d 291, 294 (5th Cir.1980); Hatfield v. Seaboard Air Line R.R. Co., 396 F.2d 721, 724 (5th Cir.1968). Hence, if there is a compromised finding on liability, a separate trial on damages alone will not suffice--both liability and damages must be relitigated in a new trial. Id.
 
 
 16
 With this admonition in mind, we focus our attention on whether the district court abused its discretion in rejecting the compromise claim. "A compromise verdict is one where it is obvious that the jury compromised the issue of liability by awarding inadequate damages." Freight Terminals Inc. v. Ryder System, Inc., 461 F.2d 1046, 1053 (5th Cir.1972). However, a review of the cases from the former Fifth Circuit Court of Appeals establishes that a nominal or inadequate finding of damages by itself does not automatically mandate the conclusion that the award was the product of a compromise verdict. See, e.g., Hadra v. Herman Blum Consulting Engineers, 632 F.2d 1242, 1247 (5th Cir.1980), cert. denied, 451 U.S. 912, 101 S.Ct. 1983, 68 L.Ed.2d 301 (1981); Davis v. Becker & Associates, Inc., 608 F.2d 621 (5th Cir.1979); Bassett Furniture Industries of North Carolina, Inc. v. NVF Co., 576 F.2d 1084, 1094 (5th Cir.), reh. denied with opinion, 583 F.2d 778 (5th Cir.1978); Parker v. Wideman, 380 F.2d 433, 437 (5th Cir.1967). Indeed, if inadequate damages was the sole test for a compromise, Rule 59(a) would have little or no purpose. Rather, our inquiry must concentrate on any indicia of compromise apparent from the record, Hatfield, 396 F.2d 721, 723-24, and other factors which may have caused the jury to return a verdict for inadequate damages. See Hadra, 632 F.2d 1242, 1244 n. 1. Only if the "totality of the circumstances" indicates that the issue sought to be excluded by a partial new trial is not separable from the error in the damage award, will a plenary new trial be authorized. See Williams v. Slade, 431 F.2d 605, 609 (5th Cir.1970).
 
 
 17
 Two former Fifth Circuit cases offer instructive examples of situations where the record contained adequate indications of compromise to warrant a complete new trial. In Hatfield, the court held that a jury verdict finding liability and awarding $1.00 in damages was the result of a compromise. The court found that under all the circumstances, including the jury's confusion concerning contributory negligence and the fact that it took two days to return a verdict, there was strong support for the conclusion that the inadequate award of damages was the culmination of a compromise among the jurors. The former Fifth Circuit again determined that the jury probably compromised in Lucas v. American Manufacturing Co., 630 F.2d 291 (5th Cir.1980). In Lucas, the trial judge admonished the jury to return a verdict quickly because a hurricane was approaching the city. The jury did so, but after finding the defendant liable, awarded the plaintiff patently inadequate damages. On appeal, the Fifth Circuit remanded for a new trial on liability and damages. The court reasoned that in their haste to decide the case before the arrival of the hurricane, the jurors probably compromised, agreeing to find liability only if the damages were kept to a minimum.
 
 
 18
 By contrast, the court has rejected the compromise theory when the record discloses another basis for the improper award. For example, in Hadra v. Herman Blum Consulting Engineers, 632 F.2d 1242 (5th Cir.1980), cert. denied, 451 U.S. 912, 101 S.Ct. 1983, 68 L.Ed.2d 301 (1981), the jury found that the defendant had breached the plaintiff's employment contract but awarded no damages. The district court ordered a new trial confined to the plaintiffs' claim of damages for the breach. The Fifth Circuit affirmed the grant of a partial new trial. The court rejected the defendant's contention that the jury verdict was the product of a compromise, thereby affirming the district court's explanation that the failure to afford monetary relief could have resulted from an improper determination that the plaintiff failed to mitigate his damages by accepting alternative employment. See 632 F.2d at 1244, n. 1. In Hadra, the court emphasized that the defendant pointed to "no circumstances, such as those listed in Hatfield, that indicate the possibility of a compromise verdict ...". Id. at 1246. Consequently, since there was sufficient evidence to support the jury's finding of liability, the court held that it was proper to order a new trial limited to damages.
 
 
 19
 The record before us confirms our belief that the liability and damages issues were also separable in this instance. First, and foremost, the jury repeatedly found that Mason failed to establish its affirmative defenses, the only basis upon which Mason could escape liability. It did so in finding against Mason on the promissory notes and accounts; it rejected the affirmative defenses again when they were asserted as grounds for setting aside the terminations of the development agreements; and once more when they constituted the foundation for the counterclaim against BKC. We can come to no other conclusion than that the jury did not believe Mason's allegations of economic coercion, fraudulent inducement or wrongful termination of the development agreements. Having clearly convinced the jury that these claims lacked merit, BKC should not have to defend against them again. Second, the record contains absolutely no indicia of a compromise other than the low amount of damages. After a long, protracted trial, the jury required only two to three hours to reach its verdict. It obviously was not deadlocked. The jury did not request additional instructions or attempt to qualify its verdict in any manner. Finally, as BKC points out, the award could be explained by reference to the use of the term "damages" on the special interrogatories. It is possible that the jury thought that BKC would receive payment on the promissory notes and accounts based solely on their finding that BKC was entitled to recover for these items and, therefore, any additional finding of "damages" would simply amount to a duplication.[3] The "totality of the circumstances" simply do not point to a compromise verdict. Viewed in this factual and procedural setting, the district court did not abuse its discretion in ordering the partial new trial.
 
 B. Franchise Termination Verdict Form
 
 20
 Special Issue # 5 sought a determination of the validity of BKC's terminations of Mason's franchise agreements. The jury could find: (a) BKC properly terminated all of the agreements; (b) BKC wrongfully terminated all of the agreements; or (c) BKC properly terminated the franchises listed in column one and wrongfully terminated the franchises listed in column two. The jury circled alternative (c), but after designating some franchise numbers under the properly terminated column, crossed them out and wrote "none". The jury specified only twelve of the twenty-seven franchise agreements at issue in the wrongfully terminated column.[4]
 
 
 21
 Again, neither party requested that the issue be resubmitted to the jury for clarification. As a result, the jury was discharged without the opportunity to correct these inconsistencies, leaving the district court with the difficult task of interpreting the verdict. In a post trial motion, BKC sought a judgment notwithstanding the verdict, claiming that the evidence established that all of the franchises had been properly cancelled. Alternatively, BKC asked for a new trial on all of the franchise terminations. As expected, Mason took the opposite position, asserting that the verdict correctly found that all of the franchises were wrongfully terminated. The district court rejected all of those contentions, instead ordering a new trial for the restaurants which were not listed in either column. In its order, the court stated that "[i]t [was] very uncertain ... whether [the jury] made any determination as to the other restaurants [not listed] ... [and] it would not serve the best interests of justice for the court to attempt to read the jury's mind in an effort to resolve this ambiguity." R. 3136.
 
 
 22
 Mason faults the trial court for its failure to construe these responses as a finding that all of the franchises had been wrongfully terminated. Emphasizing the district court's duty to attempt to reconcile inconsistent special verdicts, Mason claims that the district court was required to so conclude because the jury's answer that "none" were properly cancelled obviously indicates that the jury decided that all twenty-seven terminations were without legal cause. Mason makes this argument in spite of the fact that the jury did not select that alternative on the verdict form and only identified twelve franchises in that category.
 
 
 23
 As stated before, the district court has authority under Rule 59(a) of the Federal Rules of Civil Procedure to order a partial new trial. Even though more stringent appellate review is called for when the trial court orders a new trial, the abuse of discretion standard still controls our consideration of the decision. See, e.g., Williams v. City of Valdosta, 689 F.2d 964, 974 (11th Cir.1982); Rabun v. Kimberly-Clark Corp., 678 F.2d 1053 (11th Cir.1982).
 
 
 24
 A trial judge must make all reasonable efforts to reconcile an inconsistent jury verdict and "if there is a view of the case which makes the jury's answers consistent, the court must adopt that view and enter judgment accordingly." Griffin v. Matherne, 471 F.2d 911, 915 (5th Cir.1973). See, e.g., Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, 369 U.S. 355, 364, 82 S.Ct. 780, 786, 7 L.Ed.2d 798, 806-807 (1962); Aquachem Company, Inc. v. Olin Corp., 699 F.2d 516, 521 (11th Cir.1983); Miller v. Royal Netherlands Steamship Co., 508 F.2d 1103, 1106 (5th Cir.1975). The test employed in determining whether a conflict in the verdict can be reconciled is "whether the answers may fairly be said to represent a logical and probable decision on the relevant issues as submitted ...". Griffin, 471 F.2d at 915. However, if the jury's answers are so ambiguous or conflicting that they cannot be reconciled fairly, the trial court may not enter judgment thereon. Royal Netherlands Steamship Co. v. Strachan Shipping Co., 362 F.2d 691, 694 (5th Cir.1966), cert. denied, 385 U.S. 1004, 87 S.Ct. 708, 17 L.Ed.2d 543 (1967). A special verdict which does not resolve the essential facts, or does so in an inexplicable fashion, will not support a judgment. Prentice v. Zane's Administrator, 49 U.S. (8 HOW.) 470, 484, 12 L.Ed. 1160, 1166 (1850); Hartnett v. Brown & Bigelow, 394 F.2d 438, 441, n. 2 (10th Cir.1968). Moreover, trial judges are not empowered to fill in facts omitted from the answer to a special interrogatory. Guidry v. Kem Manufacturing Co., 598 F.2d 402 (5th Cir.), reh. denied with opinion, 604 F.2d 320, 321 (5th Cir.1979). When an insurmountable inconsistency or ambiguity is perceived, the trial court may resubmit the issue to the jury before it is dismissed or order a new trial on some or all of the issues. Nordmann v. National Hotel Co., 425 F.2d 1103, 1106 (5th Cir.1970).[5]
 
 
 25
 Without doubt, the response to special issue # 5 was both inconsistent and ambiguous. If the jury intended to find that all of the franchises had been wrongfully terminated, it could have selected alternative (b)--it did not. Thus, the choice of alternative (c) was inconsistent with its answer that none of the franchises had been properly terminated. More significantly, the answer does not resolve the disposition of over half of the franchises. As the district court observed, it is not clear what the jury found, if anything, with respect to the omitted franchises. The trial court properly declined to supply facts submitted for the jury's determination but left unanswered. Guidry, 598 F.2d 402. Inconsistent or ambiguous verdicts must be reconciled only if that can be accomplished from a fair reading of the verdict. Griffin, 471 F.2d at 915. Faced with this incompatible answer, we have no criticism of the district court's exercise of its discretion in this instance.
 
 III. Material Breach Instruction
 
 26
 In its cross-appeal, BKC challenges the finding that some of the franchises were wrongfully terminated. The source of this complaint is the district court's instruction to the jury that a franchise could not be revoked absent a "material" breach of the particular agreement. This, BKC says, is an erroneous statement of Florida law. In essence, BKC urges that it was entitled to strictly enforce the termination provisions of the agreements without regard to the materiality of the alleged defaults.
 
 
 27
 Although the Florida courts have recognized that the terms of franchise agreements are enforceable, North Dade Imported Motors, Inc. v. Brundage Motors, Inc., 221 So.2d 170, 177 (Fla.Dist.Ct.App.), "it is elementary that the mere breach of an agreement which causes no loss ... will not sustain a suit ... for damages, much less rescission." Block v. City of West Palm Beach, 112 F.2d 949, 952 (5th Cir.1940) (quoted in, Westcap Government Securities, Inc. v. Homestead Air Force Base Federal Credit Union, 697 F.2d 911, 913 (11th Cir.1983)). Pursuant to this rule, the Florida courts, and this court construing Florida law, have held that a party may not escape performance under a contract on the ground that a tender was not made by the date specified in the contract. Rather, a party who tenders late may enforce the contract with due allowance for any damage caused by the tardiness. See, e.g., Westcap Government Securities, Inc., 697 F.2d at 914; Blaustein v. Weiss, 409 So.2d 103 (Fla.Dist.Ct.App.1982); Jackson v. Holmes, 307 So.2d 470 (Fla.Dist.Ct.App.), cert. denied, 318 So.2d 404 (Fla.1975); Larsen v. Miami Gardens Dev. Corp., 299 So.2d 50 (Fla.Dist.Ct.App.1974); National Exhibition Co. v. Ball, 139 So.2d 489 (Fla.Dist.Ct.App.1962). Indeed, a Florida court has refused to countenance unilateral cancellation in that context even when the contract stipulated that time was of the essence. Jackson, 307 So.2d at 471-472. Thus, although as a general rule parties to a contract may strictly enforce its terms and the courts will not rewrite an agreement to undo the consequences of a bad bargain, see, e.g., Sapienza v. Bass, 144 So.2d 520 (Fla.Dist.Ct.App.1962), the Florida courts do not blindly sanction unilateral termination of contracts when a default causes no harm to the party seeking to avoid performance.
 
 
 28
 Consistent with this principle, the Florida courts have indicated that the materiality of a breach is relevant when a party seeks to terminate or rescind a contractual relationship. See, e.g., Callins v. Abbatecola, 412 So.2d 58 (Fla.Dist.Ct.App.1982) (when a party sought to terminate a real estate contract on the ground that the purchaser's check was returned for insufficient funds, the court stated that "the question involved here is ... whether [the tender of a bad check] ... constituted such a material breach ... as to justify ... termination ...". Id. at 59); Gittlin Companies, Inc. v. David & Dash, Inc., 390 So.2d 86 (Fla.Dist.Ct.App.1980) (rescission of distributorship contract was not justified when the defendant made direct sales in violation of the exclusive distribution provision of the distributorship agreement because the breach was not material or substantial). In Gittlin Companies, 390 So.2d at 86, the Florida court cited McAlpine v. Aamco Automatic Transmissions, Inc., 461 F.Supp. 1232 (E.D.Mich.1978), in support of its holding that an immaterial breach of a distributorship agreement did not excuse performance. The McAlpine opinion states the rule followed by the district court in this case:
 
 
 29
 A material breach would allow the franchisees to terminate their Franchise Agreements and discontinue future performance. An immaterial breach would allow the franchisees to sue for any damage caused, but they would still be bound to continue performance under the contract.
 
 
 30
 461 F.Supp. at 1249.
 
 
 31
 We conclude that the district court's instruction comported with substantial Florida case law and reject BKC's argument to the contrary.[6]IV. Post-Termination Trademark Use
 
 A. Background
 
 32
 Each of the franchise agreements stipulates that upon termination of the franchise, the franchisee must discontinue use of the Burger King trademarks. Following the May 1979 unilateral cancellation of all 27 of Mason's franchises, Mason sought an injunction to prohibit BKC from interfering with the operation of its restaurants as Burger King franchises. At the August 1979 evidentiary hearing on this motion, BKC advised the court that it would maintain the status quo, e.g. it would not force Mason to cease operating under the Burger King name, pending a final resolution of the franchise dispute. However, BKC conditioned this offer on its right to later pursue relief for the post-termination operation. Although Mason made no explicit response to this proposal, no further mention was made of this issue and Mason limited its proof and arguments to other remedies. Thereafter, BKC provided supplies to and accepted royalties from the Mason franchises during the litigation.
 
 
 33
 BKC amended its complaint to add a cause of action under the Lanham Act, 15 U.S.C. Sec. 1114(1)(a), for Mason's post-termination use of the Burger King trademarks. At the close of the 1980 jury trial, the district court granted Mason's motion for a directed verdict on the Lanham Act claim. After doing so, the district court permitted BKC to again amend its complaint to include claims for common law trademark infringement, unfair competition and breach of contract based upon Mason's use of the trademarks at any restaurants whose franchise revocations might be adjudicated valid in the second trial. Finally, following the second jury's finding that certain franchises had been legally terminated, the district court proceeded with a bench trial on BKC's common law trademark, unfair competition and breach of contract causes of action. The district court held that Mason breached the franchise provisions prohibiting use of the Burger King trademark after invalidation of the agreement. Concluding that Mason had been "unjustly enriched" by this breach, the district court awarded BKC the profits earned by Mason as a consequence of the post-termination operation of these franchises as "compensatory damages" for the violation. In this order, the court found that BKC did not consent to the post-termination use of the trademark.
 
 B. Lanham Act Claim
 
 34
 By way of cross-appeal, BKC asserts that the district court erred in directing a verdict favorable to Mason during the first jury trial on its Lanham Act claim for post-termination trademark infringement.[7] BKC maintains that it established the essential elements of federal trademark infringement when it proved that Mason displayed the Burger King marks after its right to do so had been revoked. We agree.
 
 
 35
 In order to prevail on a trademark infringement claim, the registrant must show that (1) its mark was used in commerce by the defendant without the registrant's consent and (2) the unauthorized use was likely to cause confusion, or to cause mistake or to deceive. 15 U.S.C. Sec. 1114(1)(a). Ordinarily, trademark infringement cases are predicated on the complaint that the defendant employed a trademark so similar to that of the plaintiff that the public will mistake the defendant's products for those of the plaintiff. See, e.g., Exxon Corp. v. Texas Motor Exchange of Houston, Inc., 628 F.2d 500 (5th Cir.1980). Also, it is well established that "falsely suggesting affiliation with the trademark owner in a manner likely to cause confusion as to source or sponsorship constitutes infringement." Professional Golfers Ass'n of America v. Bankers Life & Casualty Co., 514 F.2d 665, 670 (5th Cir.1975) (emphasis supplied). See also, Control Components, Inc. v. Valtek, Inc., 609 F.2d 763, 770 (5th Cir.), cert. denied, 449 U.S. 1022, 101 S.Ct. 589, 66 L.Ed.2d 484 (1980). Thus, a trademark infringement case need not just involve imitation of the registrant's mark. The unauthorized use of a trademark which has the effect of misleading the public to believe that the user is sponsored or approved by the registrant can constitute infringement. Professional Golfers Ass'n, 514 F.2d at 670. The Lanham Act cause of action was based on the theory that by using the Burger King trademarks after the trademark license had been cancelled, Mason falsely suggested that its restaurants were sponsored by and affiliated with BKC. Because this type of infringement is cognizable under the Lanham Act, we must examine BKC's proof in light of the requirements of the statute.
 
 
 36
 Mason denies the use of BKC's trademark without consent because after the terminations, BKC provided supplies bearing the Burger King trademarks and accepted royalties from the Mason group. This point was stressed on several occasions in the district court. Mason advanced this argument for the first time during the hearing on Mason's motion for a directed verdict on the Lanham Act claim. The trial judge granted the motion without stating his reasons. Mason had insisted that a directed verdict was mandated because (1) BKC consented to the use of the trademark and (2) BKC did not show likelihood of confusion. Subsequently, BKC amended its complaint to allege common law trademark infringement, unfair competition and breach of contract arising from Mason's post-termination use of the trademarks. BKC and Mason stipulated that any relief for these claims would be determined by the district court in a bench trial following the second jury trial if any of the franchises were found to have been properly terminated. At the subsequent bench trial, Mason asserted that BKC could not recover for common law trademark infringement because BKC consented to Mason's continued use. The consent issue was finally resolved adversely to Mason by the district judge in his findings of fact rendered after the bench trial. The court found that rather than acquiescing in the infringement, BKC agreed at the August 1979 hearing that it would allow Mason to continue operating restaurants under the Burger King banner, provided that it retained its right to seek damages upon a later determination of its right to cancel any or all of the remaining franchises. The court found that Mason had "ratified" this proposal, and therefore, was estopped from claiming that BKC had agreed to the trademark use.
 
 
 37
 The trial court reasonably could infer that Mason acquiesced in BKC's offer to permit Mason to continue to operate its restaurants upon the condition that BKC retained its right to recover for post-termination trademark infringement. Mason did not object to this approach and acted in a manner consistent with acceptance until the close of the 1980 jury trial. From our review of the record, we cannot say that a finding of estoppel under these circumstances was clearly erroneous.
 
 
 38
 Because Mason used the Burger King trademarks after the revocation of that right without BKC's consent, a trademark infringement claim was established so long as the trademarks were employed in a manner that was likely to cause confusion, to cause mistake or to deceive. 15 U.S.C. Sec. 1114(1)(a). Common sense compels the conclusion that a strong risk of consumer confusion arises when a terminated franchisee continues to use the former franchisor's trademarks. A patron of a restaurant adorned with the Burger King trademarks undoubtedly would believe that BKC endorses the operation of the restaurant. Consumers automatically would associate the trademark user with the registrant and assume that they are affiliated. Any shortcomings of the franchise therefore would be attributed to BKC. Because of this risk, many courts have held that continued trademark use by one whose trademark license has been cancelled satisfies the likelihood of confusion test and constitutes trademark infringement. See, e.g., United States Jaycees v. Philadelphia Jaycees, 639 F.2d 134 (3d Cir.1981); Professional Golfers Ass'n v. Bankers Life & Casualty Co., 514 F.2d 665 (5th Cir.1975); Prompt Electric Supply Co., Inc. v. Allen-Bradley Co., 492 F.Supp. 344, 349 (E.D.N.Y.1980); National Board of YWCA v. YWCA of Charleston, S.C., 335 F.Supp. 615, 628-629 (D.S.C.1971). BKC proved that Mason employed the Burger King trademarks after its franchise agreements were properly cancelled. This use was without BKC's consent and was likely to cause confusion. Accordingly, we hold that the district court erred in directing a verdict against BKC on its Lanham Act complaint and remand for a determination of the appropriate relief in conformity with 15 U.S.C. Sec. 1117.[8]
 
 
 39
 C. Damages for Breach of the Franchise Agreements
 
 
 40
 As pointed out earlier, the district court concluded that Mason breached the provisions of the franchise agreements which prohibited the post-termination use of the Burger King trademarks. Although BKC also argued that Mason was guilty of common law trademark infringement and unfair competition through the continued use of the trademark, the district court made no findings on those claims. Then, after ruling that BKC had not shown certain consequential damages from the post-termination use of the trademarks, the court awarded BKC the profits that Mason earned at the properly terminated franchises as "compensatory damages" for the breach. BKC complains that the trial court should have allowed consequential damages; Mason, on the other hand, alleges that the trial court erred in ordering it to disgorge the profits.
 
 
 41
 BKC's assertions need not detain us long. It sought damages based on its contention that Mason's continued operation damaged its reputation and thwarted its plans to expand in the areas in which Mason franchises were located. After considering BKC's evidence in support of those damages, the district court determined that (1) BKC had not established that Mason had tarnished its image, and (2) BKC did not prove that Mason's failure to close its stores prevented BKC from carrying out its marketing or development plans. Contrary to BKC's suggestion, the district court did not deny damages because the amounts were uncertain--the court found that BKC did not prove that Mason's actions caused the claimed harm.
 
 
 42
 This factual finding was not clearly erroneous. A reading of the record confirms that BKC did not prove with sufficient certainty that Mason's continued operation caused the purported injury. While it is clear that a wrongdoer cannot escape liability simply because the harm he caused is difficult to value, see, e.g., ABC-Paramount Records, Inc. v. Topps Record Distributing Co., 374 F.2d 455 (5th Cir.1967), it is equally well established that a plaintiff must make a positive showing that the defendant was in fact responsible for the alleged damages. See, e.g., Asgrow-Kilgore Co. v. Mulford Hickerson Corp., 301 So.2d 441, 445 (Fla.1974). BKC simply failed to meet its burden of proof.
 
 
 43
 The award of profits is more troublesome. Mason and BKC focus their arguments on the propriety of ordering an accounting of profits for trademark infringement. As the parties recognize, a trademark infringer can be required to turn over the profits he earns during the period of the infringement subject to the discretion of the district judge and in light of the equities of the case. 15 U.S.C. Sec. 1117. See, e.g., Maltina Corp. v. Cawy Bottling Co., Inc., 613 F.2d 582 (5th Cir.1980); Mead Johnson & Co. v. Baby's Formula Service, Inc., 402 F.2d 19 (5th Cir.1968). However, the district court did not find that Mason infringed upon a trademark. Rather, faced with BKC's claims for trademark infringement, unfair competition and breach of the franchise agreements, the trial judge found only that Mason violated the franchise agreements. For that infraction, the court awarded Mason's profits as "compensatory damages."[9]
 
 
 44
 Although an award of the infringer's profits can be an appropriate measure for damages for federal or state trademark infringement, e.g. Maltina Corp., 613 F.2d at 584-585; 15 U.S.C. Sec. 1117; Fla.Stat.Ann. Secs. 495.131, 495.141 (West 1972), disgorgement of profits earned is not the remedy for breach of contract. Under Florida law, a contract plaintiff may recover damages in an amount which will place him in the position that he would have obtained but for the breach or the damages that are the natural and proximate result of the default, subject to the rules of foreseeability and certainty. 17 Fla.Jur.2d Damages Sec. 26 (1980); Juvenile Diabetes Research Foundation v. Rievman, 370 So.2d 33 (Fla.Dist.Ct.App.1979); Popwell v. Abel, 226 So.2d 418 (Fla.Dist.Ct.App.1969); Olin's Inc. v. Avis Rental Car System of Florida, Inc., 172 So.2d 250 (Fla.Dist.Ct.App.), cert. denied, 177 So.2d 482 (Fla.1965). In some cases, if the offending conduct causes the non-breaching party to lose profits, the defendant can be required to compensate the plaintiff for the lost profits. Sampley Enterprises, Inc. v. Laurilla, 404 So.2d 841 (Fla.Dist.Ct.App.1981). Consequently, if BKC had demonstrated that Mason's refusal to cease operation after the terminations, as required by the franchise agreements, caused the injury to its reputation or the delay in development as it claimed, those damages could have been recovered as the natural and proximate result of the breach. But the district court found that Mason's breach did not cause that harm.
 
 
 45
 There is no support in the record that the profits earned by Mason equalled BKC's damages from the breach. That would be correct only if BKC proved that it would have taken over the operation of the franchises after termination and BKC reasonably could have earned the profits that were generated by Mason from such operation. Because BKC failed to show that it was entitled to Mason's profits as compensation for the breach, the award of such profits as compensatory damages for breach of contract was error and must be vacated.[10]
 
 
 46
 D. Remand for Determination of Lanham Act Damages.
 
 
 47
 We have concluded that Mason's post-termination use of the Burger King trademarks at those restaurants whose franchise agreements were lawfully cancelled constituted trademark infringement under Sec. 1114(1)(a) of the Lanham Act. We also hold that it was error to award profits, a trademark infringement remedy, for breach of the franchise agreements. While it may be tempting to simply treat the profits fixed as damages for the breach of contract as the proper measure of recovery for the Lanham Act trademark infringement and, consequently, avoid the necessity of a remand, such a course of action would be an improper exercise of our appellate role.
 
 
 48
 The damages provision of the Lanham Act stipulates:
 
 
 49
 When a violation of any right of the registrant of a mark registered in the Patent and Trademark Office shall have been established in any civil action arising under this chapter, the plaintiff shall be entitled, subject to the provisions of sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all elements of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstance shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.
 
 
 50
 15 U.S.C. Sec. 1117 (emphasis supplied).
 
 
 51
 This section vests considerable discretion in the district court. Guided by the principles of equity, the court may award the defendant's profits. Additional extraordinary relief such as treble damages and attorney's fees are available under the statute if the district court believes that such an assessment would be just. The statute also provides for the adjustment of any profits award if it is inadequate or excessive. This remedial accommodation clearly envisions the exercise of the trial judge's discretion. Consequently, it would be inappropriate for this court to attempt a determination of damages in the first instance. See Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Mfg., Inc., 597 F.2d 71, 78 (5th Cir.1979). This is the traditional and statutory function of the district court.[11]
 
 V. Attorney's Fees
 
 52
 After an extensive hearing, the district court found that BKC was entitled to recover $884,924.80 in attorney's fees and $94,570.83 in related expenses. The court denied BKC's claim for attorney's fees for the services performed by its "in-house" lawyers. Mason challenges the award on several grounds. BKC contends that it is entitled to fees for the services of its house counsel.
 
 A. Contract Provision
 
 53
 Approximately $600,000.00 of the fee award was allocated to work done in connection with the termination of the development agreements. The attorney's fees provision of the development agreements states that:
 
 
 54
 In the event Developers [Mason] dispute Burger King Corporation's termination of this Agreement and legal action is commenced, Developers shall indemnify and reimburse Burger King Corporation for costs and attorney's fees in successfully defending such action.
 
 
 55
 Exh. 289, R. 4500-4554 (emphasis supplied). Mason urges that because BKC initiated the action against it, seeking a declaratory judgment on the propriety of the terminations, attorney's fees are not authorized under this provision of the contract. According to Mason, fees are available only for the defense of legal action relating to termination of the development agreements.
 
 
 56
 We agree that BKC could not claim attorney's fees pursuant to this clause of the contract unless it was put to the task of defending legal action concerning the terminations. It seems clear to us that the term "action" appearing near the end of the provision refers to the "legal action" mentioned at the beginning, as opposed to the "action" of terminating the agreements in general. However, this observation does not negate the right to attorney's fees since BKC did in fact defend legal action to uphold the terminations. In response to BKC's original complaint, Mason contended that the development agreements were illegally cancelled and filed a counterclaim for specific performance and damages for wrongful termination. By this counterclaim, BKC was placed in the position of defending a lawsuit for wrongful termination of the development agreements--a situation squarely within the terms of the attorney's fee provision.
 
 
 57
 Under Florida law, a contract which provides for the payment of attorney's fees is binding and must be enforced by the trial court. See, e.g., Brickell Bay Club Condominium Ass'n, Inc. v. Forte, 397 So.2d 959, 960 (Fla.Dist.Ct.App.), petition for review denied, 408 So.2d 1092 (Fla.1981); Silver Blue Lake Apartments, No. 3, Inc. v. Manson, 334 So.2d 48 (Fla.App.1976). Consequently, the district court did not err in awarding attorney's fees as provided in the contract.
 
 B. Computation of Fees
 
 58
 The district court determined that 68% of the total time which BKC's attorneys devoted to the Mason-BKC litigation was spent on issues compensable under the terms of certain contracts or pursuant to Florida Statute Sec. 57.105. In reaching this conclusion, the court stated:
 
 
 59
 23. Burger King's attorneys failed to maintain their time records in a fashion which would facilitate an easy delineation by the Court between fees attributable to compensable and non-compensable matters. This necessarily leads to a certain imprecision in the Court's allocation
 
 
 60
 * * *
 
 
 61
 25. Burger King's counsel worked on both issues for which attorney's fees can properly be awarded and on other non-compensable issues. The fees and disbursements which Burger King has paid [to its outside lawyers] must be allocated among the various issues in the case. While no mathematically precise allocation can be made because of the overlapping of issues and the absence of specific detailed records, the court is still in a position to make a competent and reasonable allocation. Such allocation is as follows:
 
 
 62
 1. The termination of development agreements--45%
 
 
 63
 2. Promissory notes and leases--20%
 
 
 64
 3. The successful defense of claims to which Fla.Stat. Sec. 57.105 is applicable--3%.
 
 
 65
 26. The percentage allocation in the above finding is based upon the evidence presented at trial and the court's own familiarity with the case ....
 
 
 66
 Findings of Fact and Conclusions of Law, April 5, 1982.
 
 
 67
 Mason challenges this method of assessing the fees, claiming that attorney's fee awards are an abrogation of the common law and, as such, strong proof of entitlement is mandatory. Mason urges this court to disallow the award or reduce it substantially because of BKC's failure to maintain precise issue-by-issue time records. Mason cites a number of bankruptcy cases for the proposition that fees must be denied when the attorney's time records are inadequate. See, e.g., In re First Colonial Corp. of America, 544 F.2d 1291 (5th Cir.1977), cert. denied, 431 U.S. 904, 97 S.Ct. 1696, 52 L.Ed.2d 388 (1977); In re Meade Land & Development Co., Inc., 527 F.2d 280 (3d Cir.1975); In re Orbit Liquor Store, 439 F.2d 1351 (5th Cir.1971).
 
 
 68
 This argument is unpersuasive. As the district court noted, the issues in this case overlapped to a significant extent. For example, BKC's proof of its grounds for termination of the development agreements (a compensable issue) also served as proof of the propriety of some of the franchise terminations (a non-compensable issue). The district judge was forced into the role of a referee in the conduct of this litigation over an extended period of time. Needless to say, he was intimately familiar with the issues in the case. He was in an excellent position to estimate the amount of lawyer time devoted to the various issues before him.
 
 
 69
 Moreover, the Florida appellate courts have approved of attorney's fees awards based upon estimates by the trial judge of the time reasonably necessary to the ultimate task. See, e.g., Florida Department of Natural Resources v. Gables-By-the-Sea, Inc., 374 So.2d 582, 585 (Fla.Dist.Ct.App.1979), cert. denied, 383 So.2d 1203 (1980). Cf., R.H. Coody & Assoc., Inc. v. Shelton, 352 So.2d 852 (Fla.1977) (court found rate excessive but did not object to estimate of time when attorney did not keep time records). Indeed, in Gables-By-the-Sea, the appellate court sanctioned an attorney's fee determination in a case in which the trial judge stated:
 
 
 70
 The [c]ourt recognizes that in this case hours were not specifically kept and the hours that were stated as estimates are estimates ... Considering the testimony ... the [c]ourt is awarding the sum of $850,000 in attorneys' fees.
 
 
 71
 374 So.2d at 585. Mason was responsible for BKC's attorney's fees because the parties agreed to such indemnification by contract. Florida law permits attorney's fees to be determined in the manner employed by the district court. Under the circumstances, the fee satisfies the reasonableness standard.
 
 C. Florida Statute Sec. 57.105
 
 72
 The district court ruled that 3% of BKC's attorney's fees were attributable to the defense of claims governed by Florida Statute Sec. 57.105. That statute provides:
 
 
 73
 The Court shall award a reasonable attorney's fee to the prevailing party in any civil action in which the Court finds that there was a complete absence of a justiciable issue of either law or fact raised by the losing party.
 
 
 74
 In granting attorney's fees under Sec. 57.105 because of Mason's prosecution of Counts III, VII and X of the second amended counterclaim, the court stated only that Counts III and VII had been voluntarily dismissed and Count X was dismissed by a directed verdict. Mason maintains that under Florida law, a voluntary dismissal or a directed verdict does not justify the application of Sec. 57.105. BKC concedes the correctness of this interpretation of Florida law, but insists that Counts III, VII and X were frivolous, and hence, the district court properly invoked the sanctions of Sec. 57.105.
 
 
 75
 Even though the purpose of Sec. 57.105 is to prevent the "reckless waste of judicial resources as well as the time and money of prevailing litigants", Whitten v. Progressive Casualty Insurance Co., 410 So.2d 501, 505 (Fla.1982), the Sec. 57.105 award must be remanded to the district court because of a technical defect in its order. In Whitten, the Florida Supreme Court stated:
 
 
 76
 The statute [Sec. 57.105] provides that a party is entitled to an award of attorney's fees only when the court determines that there was a complete absence of a justiciable issue raised by the losing party. Without such a finding, an order assessing attorney's fees is technically deficient and must be reversed.
 
 
 77
 410 So.2d at 506. In holding that the failure to make such a finding invalidates an award under Sec. 57.105, the Florida court cited a number of Florida appellate decisions. Significant to our review, however, is the Whitten court's "but see" citation to Autorico, Inc. v. Government Employees Insurance Co., 398 So.2d 485, 488 (Fla.Dist.Ct.App.1981). Autorico held that the absence from the order of the magic words "complete absence of a justiciable issue of law or fact" required by the statute does not invalidate the award. The Autorico appellate court reasoned that since Sec. 57.105 governs only when there is a complete absence of a justiciable issue the requisite finding "is implicit in an order which grants a motion for said fees based entirely upon [Sec. 57.105]." 398 So.2d at 488.
 
 
 78
 Were we writing on a clean slate, the Autorico analysis might have more appeal. It is obvious to us that by awarding fees pursuant to Sec. 57.105, the trial judge found that the claims met that statutory standard. Nevertheless, we are bound to follow the Florida Supreme Court's later pronouncement in Whitten which compels the trial court to spell out its finding of the statute's requirements. At least one Florida appellate court since the Whitten decision has construed Whitten as requiring a remand of an award made "pursuant to Sec. 57.105" because the trial court did not include the statute's language in its order. Apgar & Markham Construction of Florida, Inc. v. Macasphalt, Inc., 424 So.2d 41 (Fla.Dist.Ct.App.1982). We have been unable to locate any more recent authority to the contrary. In light of the Florida cases available to us, we have no alternative but to remand the Sec. 57.105 award to the district court for a determination of whether Counts III, VII and X presented any justiciable issues of either law or fact. Id. at 42.[12]
 
 D. In-House Counsel Fees
 
 79
 Finally, BKC assigns as error to the district court's refusal to include the services of its house counsel as a part of the attorney's fees. In rejecting BKC's request, the district court stated:
 
 
 80
 Attorney's fees for the services of in house counsel are not recoverable. There is no precedent in Florida law for an award of attorney's fees for the services of in-house counsel. Cases from other jurisdictions awarding fees for the services of in-house counsel who actively tried the case are not factually similar to this case when in-house counsel acted primarily as a liaison between the client and outside counsel who had complete responsibility for the conduct of the case.
 
 
 81
 Findings of Fact and Conclusions of Law, April 5, 1982.
 
 
 82
 We agree with the district court. First, there is no Florida authority to justify, much less mandate, such an award. Travelers Indemnity Co. v. Thomas, 315 So.2d 111 (Fla.Dist.Ct.App.1975), cert. denied, 336 So.2d 108 (Fla.1976), upon which BKC places significant reliance, does not support BKC's position. In Travelers Indemnity, the court indicated in dicta that a party could recover the reasonable value of services performed by in-house counsel "in instances where the defense was furnished by house counsel." Id. at 114 (emphasis supplied). As the district court found, however, BKC's lawyers acted only in a liaison capacity. Outside counsel was responsible for handling the case. Our reading of Travelers Indemnity confirms that the court did not intend to suggest, much less require, that in-house counsel fees should be assessed in this situation.
 
 
 83
 Second, a recovery of the "reasonable value" of BKC's in-house lawyers' time is not necessary to indemnify BKC for the expenditures incurred as a result of the litigation.[13] A contract provision which specifies that attorney's fees must be paid in the event of litigation is enforceable in Florida "as an agreement for indemnification." Trustees of Cameron-Brown Investment Group v. Tavormina, 385 So.2d 728, 731 (Fla.Dist.Ct.App.1980). BKC did not have to pay out additional money for the services of its house counsel, so it cannot claim "reimbursement" for this pro-rata share of its fixed corporate expense. The district court did not err in declining to charge Mason an amount representing either the cost or the value of BKC's corporate employees.
 
 VI. Conclusion
 
 84
 We have examined the remaining issues raised by the parties: (1) the district court's refusal to direct a verdict for Mason on the franchise terminations based upon the pledge of stock to the Pittsburg National Bank and the sale of stock to John Mosher prior to BKC's approval of the transfer of the franchise agreement to the corporation; (2) the district court's direction of a verdict against BKC on the franchise termination predicated upon a transfer of an interest in the profits of a restaurant; and (3) the district court's alleged abuse of discretion in limiting the cross-examination of Helen O. Donaldson and excluding a letter from Mason's accountant to BKC offered during the cross-examination. After careful consideration, we find these assignments of error lack any merit and warrant no further discussion.
 
 
 85
 We VACATE the attorney's fees award made pursuant to Fla.Stat. Sec. 57.105 and the damages assessed for breach of the franchise agreements. We REMAND to the district court for (1) a finding of whether the statutory requirements of Fla.Stat. Sec. 57.105 were satisfied in its award of attorney's fees and (2) a determination of the relief under the Lanham Act, 15 U.S.C. Sec. 1117. In all other respects, the judgment of the district court is AFFIRMED.
 
 APPENDIX
 SPECIAL ISSUE NO. 5
 
 86
 With respect to BURGER KING CORPORATION's claims regarding termination of the franchise agreements, we the jury find that:
 
 
 87
 A. BURGER KING CORPORATION properly terminated all of the franchise agreements,
 
 
 88
 or
 
 
 89
 B. BURGER KING CORPORATION wrongfully terminated all of the franchise agreements,
 
 
 90
 or
 
 
 91
 C. BURGER KING CORPORATION properly terminated the franchise agreements covering the restaurants listed in Column 1 and wrongfully terminated the franchise agreements covering the restaurants listed in Column 2.
 
 
 92
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 
 [1]
 As affirmative defenses to liability on the notes and the accounts, Mason claimed that (1) BKC was guilty of economic coercion; (2) BKC fraudulently induced Mason to incur the liabilities; and (3) Mason was entitled to a set-off for the full amount of the obligations because BKC wrongfully terminated the development agreements. These contentions were also the subject of Mason's counterclaim
 
 
 [2]
 In Bonner v. City of Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc ), the Eleventh Circuit Court of Appeals adopted as precedent the decisions of the former Fifth Circuit issued before October 1, 1981
 
 
 [3]
 BKC offered alternative verdict forms which asked the jury to designate the amount of Mason's "liability" on the various obligations. The term "liability" would have more accurately reflected the nature of the recovery. Thus, although the proffer was rejected, BKC did attempt to avoid the potentially confusing reference to "damages"
 
 
 [4]
 The jury's answer to Special Issue # 5 is reproduced as an appendix to this opinion
 
 
 [5]
 Because of the risk of inconsistency and ambiguity which accompanies the use of special interrogatories, attorneys should pay careful attention to insuring that an acceptable verdict has been rendered before the jury is discharged from the case. Guidry, 598 F.2d at 405-06. Often the need for a new trial can be avoided by requesting resubmission to the jury. This procedure undoubtedly would have remedied the problem created by the answer to special issue # 5, since the jury could have completed its answer upon resubmission. A very cursory reading of the verdict form would have uncovered the inadequacies of the verdict. Had the attorneys examined the verdict with the same degree of vigor with which they pursued their cause at the trial and their assignments of error on appeal, valuable judicial resources could have been conserved
 
 
 [6]
 The decision in Austin's Rack, Inc. v. Austin, 396 So.2d 1161 (Fla.Dist.Ct.App.), cert. denied, 402 So.2d 607 (Fla.1981), does not compel a different result. That case held that an employer may terminate an employee if the employee commits an act specified as grounds for termination in the employment agreement. While the Austin case generally supports the proposition that parties to a contract may strictly enforce its termination provisions, even the Austin court indicated that the termination clause was reasonable. To the extent that Austin represents a contrary line of authority, we, nevertheless, find that the materiality instruction was not error. Given this possible ambiguity in the Florida authorities, we defer to the district judge's interpretation of the law of the state in which he presides. See Alabama Electric Cooperative, Inc. v. First National Bank of Akron, Ohio, 684 F.2d 789, 792 (11th Cir.1982); Kaufman & Broad Home Systems, Inc. v. International Brotherhood of Firemen & Oilers, 607 F.2d 1104, 1108 (5th Cir.1979)
 
 
 [7]
 Because the first jury did not specify any franchises under the "properly terminated" column, BKC's claim for post-termination trademark infringement at the properly terminated restaurants could not have provided any relief after the first trial. However, once some franchises were found to have been validly terminated, the issue of the correctness of the directed verdict on the Lanham Act cause of action was revived
 
 
 [8]
 See Section IV D ("Lanham Act Damages") infra
 
 
 [9]
 While at first blush it might appear that the district court, in essence, found that Mason committed common law trademark infringement, a closer reading of the findings of fact and conclusions of law and the briefs filed in the district court, reveals that the court made no finding on the trademark or unfair competition claims. The three causes of action (trademark, unfair competition and breach of the franchise agreements) were pursued and defended against separately in the trial briefs. Mason's defense against the common law trademark intrusion was the same as that advanced at the hearing on the Lanham Act violation at the first trial. The district court's order unequivocally states that Mason "breached the contractual obligations imposed on them by the provisions in each of those franchise agreements which govern the post-termination conduct of the franchisees," and that "[b]y their continued wrongful operation of each of the thirteen restaurants ... the Defendants have breached the franchise agreement relating to each restaurant." The opinion contains no reference to trademark "infringement" or the elements of a common law trademark infringement right of action. The district court's award of damages was based on the breach of the franchise agreements
 
 
 [10]
 The district court stated that the profits award prevented Mason's "unjust enrichment" from the breach. An accounting of profits may be appropriate to prevent the unjust enrichment of a trademark infringer, see, e.g., Maltina Corp. v. Cawy Bottling Co., 613 F.2d 582 (5th Cir.1980), but does not comport with the compensatory nature of breach of contract damages
 
 
 [11]
 We are cognizant of Mason's position that a recovery of profits would be improper for this trademark violation and that any such assessment would be an abuse of discretion. We set aside the profits as damages only because they are unauthorized for the breach of the franchise agreements and do not now express any opinion on this issue. However, in the interests of avoiding another appeal, we note certain principles that should guide the district court in the exercise of its discretion on remand. First, an award of attorney's fees is proper only in "exceptional cases"--the elements of bad faith or fraud must be present to support the grant of attorney's fees. See Safeway Stores, Inc. v. Safeway Discount Drugs, Inc., 675 F.2d 1160, 1169 (11th Cir.1982); Durbin Brass Works, Inc. v. Schuler, 532 F.Supp. 41, 44 (E.D.Mo.1982); Salton Inc. v. Cornwall Corp., 477 F.Supp. 975, 992 (D.N.J.1979). Second, there is no automatic right to enhanced damages. Trial judges have wide latitude in determining a just amount of recovery for trademark infringement. See Holiday Inns, Inc. v. Alberding, 683 F.2d 931, 935 (5th Cir.1982). Finally, although an accounting of profits can be an effective means to prevent the unjust enrichment of the infringer, Maltina Corp. v. Cawy Bottling Co., 613 F.2d 582 (5th Cir.1980), all monetary awards under Sec. 1117 are "subject to the principles of equity." In short, contrary to the assertions of both parties, no hard and fast rules dictate the form or quantum of relief
 
 
 [12]
 Although our remand of this award makes appellate review premature, we nevertheless emphasize that attorney's fees can be granted under Sec. 57.105 when claims have been dismissed or defeated as long as no justiciable issues of law or fact were raised by the claims. Fierer v. 18th Avenue Development Corp., 417 So.2d 1005 (Fla.App.1982). Although the dismissal by itself will not support an award, Executive Centers of America, Inc. v. Durability Seating & Interiors, Inc., 402 So.2d 24 (Fla.Dist.Ct.App.1981), "voluntary dismissal is not a bar to an award of attorney's fees." Fierer, 417 So.2d 1005
 The Florida Supreme Court has approved the following standard for the application of the attorney's fees statute:
 The requirement ... is a finding of a total or absolute lack of a justiciable issue, and to us, this is tantamount to a finding that the action is frivolous ....
 [A] trial court must find that the action is so clearly devoid of merit both on the facts and the law as to be completely untenable.
 Allen v. Estate of Dutton, 384 So.2d 171, 175 (Fla.App.), petition for review denied, 392 So.2d 1373 (Fla.1980) (emphasis in original) (cited with approval in Whitten v. Progressive Casualty Ins. Co., 410 So.2d 501, 505 (Fla.1982)). The Florida appellate courts have insisted upon strict compliance with the Allen standard. See, e.g., Lake Osborne Utilities Co., Inc. v. Sims, 411 So.2d 994 (Fla.Dist.Ct.App.1982); Braden River Civic Ass'n, Inc. v. Manatee County, 403 So.2d 1007 (Fla.Dist.Ct.App.1981). Nonetheless, one Florida appellate court affirmed an award under Sec. 57.105 when, for example, the plaintiff alleged interference with business relations and the evidence did not support any of the elements of the tort. Kisling v. Wooldridge, 397 So.2d 747 (Fla.Dist.Ct.App.1981).
 
 
 [13]
 The development agreement attorney's fees provision, which was the basis for the vast majority of the fees awarded, specifically provided that Mason would "indemnify and reimburse" BKC for attorney's fees